877 So.2d 425 (2003)
Michael L. GRIFFIN and Angela Griffin, Appellants/Cross-Appellees,
v.
Jefferson C. McKENNEY, M.D., Appellee/Cross-Appellant.
No. 2002-CA-00353-COA.
Court of Appeals of Mississippi.
October 14, 2003.
Rehearing Denied March 16, 2004.
Certiorari Denied July 15, 2004.
*429 Robert W. Smith, J.D. Lee, Biloxi, Attorneys for Appellant.
Harry R. Allen, Margaret P. McArthur, Gulfport, Attorneys for Appellee.
Before McMILLIN, C.J., THOMAS and CHANDLER, JJ.
CHANDLER, J., for the court:
¶ 1. In this medical malpractice action, Michael and Angela Griffin sued Dr. Jefferson C. McKenney in the Circuit Court of Harrison County. The jury returned a verdict for Dr. McKenney and judgment was entered accordingly. The Griffins appeal and argue that the trial court committed three evidentiary errors, improperly granted three of the defendant's jury instructions, made an erroneous statement of law to the jury, and that the verdict was against the overwhelming weight of the evidence. The Griffins contend that the errors entitle them to a new trial. Dr. McKenney has cross-appealed, and argues that the trial court erred when it found that his counsel impermissibly engaged in ex parte contact with two of Michael's treating physicians.
¶ 2. Finding no error, we affirm. As we affirm the judgment for the appellee/Dr. McKenney it is unnecessary to address the error cited by the appellee/Dr. McKenney on cross-appeal and, therefore, we decline to do so.

FACTS
¶ 3. The following facts are taken from the trial testimony. In the spring of 1999, Michael Griffin began experiencing heartburn and nausea. His family doctor diagnosed him with gallstones, and opined that he should see a surgeon to discuss the possibility of having his gallbladder removed. Michael consulted Dr. McKenney, *430 a general surgeon who had performed surgery on Michael to correct a bowel obstruction in 1992. Michael consented to have Dr. McKenney perform a laparoscopic cholysystectomy, a surgical procedure for removing the gallbladder. The procedure involved several small abdominal incisions through which tools were inserted along with a camera for viewing. Dr. McKenney performed the surgery in the morning of April 1, 1999, at Biloxi Regional Medical Center. During the surgery, in addition to removing Michael's gallbladder, Dr. McKenney lysed adhesions on Michael's bowel and performed a small bowel resection. Lyse is defined as "[t]o break up, to disintegrate, to affect lysis." Stedman's Medical Dictionary 1011 (26th ed.1995). Dr. McKenney also placed two drains in Michael's abdomen.
¶ 4. Post-operatively, blood appeared in Michael's abdominal drains, and he had a fever. Hospital staff was unable to contact Dr. McKenney until that night. Dr. McKenney transferred Michael to the intensive care unit, where he remained for approximately two days. Michael was given two units of blood during his stay in the intensive care unit.
¶ 5. Michael remained under Dr. McKenney's care once he was returned to his hospital room. Michael's fever persisted. He had elevated white blood cell counts and he was medicated for pain over the next several days. His bowel was not functioning. On April 5, a nurse changed a dressing on one of the incisions and noted a small amount of green drainage on the old dressing. On April 6, Michael's bowel began functioning again. A nurse noted purulent drainage in one of the drains. On April 7, Michael had three bowel movements. Nurses noted white and yellow drainage in the drains. On April 8, Michael was complaining of pain and cramps. Dr. McKenney noted that Michael looked well. That afternoon, a nurse removed one of the drains. She noted purulent drainage and a foul odor upon removal of the drain.
¶ 6. On April 9, Dr. Adkins, a member of Dr. McKenney's surgical group, was on call for Dr. McKenney. Dr. Adkins examined Michael and determined that he had an "acute abdomen," indicating a bowel problem. A CT scan of Michael's abdomen revealed an abscess. Dr. Adkins performed open surgery on Michael that afternoon, and discovered a large amount of small bowel content that had spread throughout the abdomen and was leaking from two perforations in Michael's bowel. Michael's abdominal cavity was riddled with abscesses, and he had a large blood clot near the site of the gallbladder removal. Dr. Adkins suctioned out the small bowel content, treated the abscesses, and performed a small bowel resection in which he removed the perforated area and reconnected the bowel.
¶ 7. After this surgery, Michael was placed on a respirator in the intensive care unit. Over the next month, Dr. Adkins had to perform four surgeries to control the infection and abscesses that had been caused by the bowel leakage. Michael developed pneumonia in his right lung. On April 26, elevated enzyme levels indicated that Michael had developed pancreatitis, an inflammation of the pancreatic glands. Michael was allowed to go home on April 28, but was readmitted to the hospital on May 2 for the fourth surgery. He remained hospitalized for ten days. He continued to have trouble with pancreatitis and returned to Dr. Adkins for treatment several times over the next few months. He also experienced shortness of breath and inflammation of the lining of the lungs from the pneumonia.
¶ 8. Michael and Angela sued Dr. McKenney for malpractice. The Griffins *431 alleged that Dr. McKenney negligently perforated the bowel during the April 1 surgery, or that injuries he caused during that surgery lead to the perforations. Additionally and alternatively, they argued that Dr. McKenney rendered negligent post-operative care that exacerbated Michael's injuries. They further argued that Dr. McKenney performed bowel surgery without Michael's informed consent. Angela asserted a claim for loss of consortium.
¶ 9. At trial, Michael testified about the pain and suffering he experienced after Dr. McKenney's surgery and during his course of recovery with Dr. Adkins. After Michael's discharge from the hospital, his recovery was slow and marked by fatigue that affected his activity level. He testified that he was still having trouble with fatigue at the time of trial. He was left with permanent abdominal scars from the multiple surgeries. He incurred $263,377.97 in medical bills and missed four months of work. Angela Griffin testified that she missed work to be with Michael in the hospital and then to care for him at home. She testified that the couple's marital relations had deteriorated due to Michael's fatigue.
¶ 10. At trial, Carmen Nicholson, a nurse who held the camera during Michael's surgery, testified that Dr. McKenney perforated Michael's bowel during the laparoscopic cholysystectomy. She stated that the reason that Dr. McKenney performed the small bowel resection was to repair the perforated area. Dr. McKenney's post-operative report did not state that he perforated the bowel, and he denied doing so. No other operative personnel recalled that Dr. McKenney caused a perforation. Nurse Nicholson stated that she witnessed Dr. McKenney repair the perforation by resecting the bowel.
¶ 11. The Griffins offered the expert testimony of Drs. Bagnato and Gordon. Those experts opined that Dr. McKenney breached the standard of care of a minimally competent, reasonably prudent general surgeon under the same or similar circumstances. Dr. Bagnato testified that a bowel perforation is one of the risks of a laparoscopic cholysystectomy because the bowel is delicate and may be accidentally perforated when the surgeon attempts to reach the gallbladder from the incision site. When a perforation occurs, the surgeon must perform a bowel resection, a procedure in which the perforated area is removed and the bowel reconnected. Dr. Bagnato opined that, based on his review of the medical records, Dr. McKenney accidentally perforated or injured Michael's bowel during the laparoscopic cholysystectomy and failed to notice and repair the injuries or perforations prior to closing the abdomen.
¶ 12. Dr. McKenney's post-operative report indicated that Dr. McKenney lysed, or removed, bowel adhesions in Michael's lower abdomen. A bowel adhesion is a section of bowel that, due to scar tissue or other cause, is adherent to other intestines or to the inside of the abdominal cavity. Dr. Bagnato testified that lysing adhesions poses a risk of bowel perforation. Dr. Bagnato testified that, during a laparoscopic cholysystectomy, a reasonably prudent general surgeon must occasionally lyse bowel adhesions in order to reach the gallbladder, but should not lyse adhesions in the areas unnecessary to the gallbladder surgery because of the risk of injuring the bowel. Dr. Bagnato testified that Dr. McKenney's lysis of adhesions in the lower abdomen, away from the operative field, was unnecessary to the gallbladder surgery and breached the standard of care.
¶ 13. Dr. McKenney's post-operative report also indicated that he performed a *432 small bowel resection because he encountered an area of bowel that "would most prudently be resected" due to a partial small bowel obstruction. Dr. Bagnato testified that a bowel obstruction cannot be diagnosed by simply examining the bowel in the absence of clinical evidence that the bowel is not functioning and symptoms such as abdominal pain. He further testified that the pathology report on the section of bowel that Dr. McKenney removed indicated that the bowel had not been obstructed. Therefore, Dr. Bagnato concluded, Dr. McKenney's decision to resect the bowel due to a bowel obstruction was a misdiagnosis that breached the standard of care.
¶ 14. Dr. Bagnato testified that the bowel could have been perforated during the April 1 surgery but not have begun to seriously leak for several days. He testified that the perforations could have been very tiny and become larger due to pressure caused when Michael's bowel resumed functioning five days after the surgery. He testified that another area of bowel or abdominal tissue could have sealed the perforations until the resumed bowel function caused serious leakage. He stated that the fact that Michael had bowel movements did not preclude the presence of perforations. Dr. Bagnato testified that Michael's fever, white blood cell count, and green drainage after the surgery indicated possible infection, should have alerted Dr. McKenney to a possible bowel problem, and should have prompted him to order a CT scan. Dr. Bagnato stated that a CT scan would have revealed any bowel perforations.
¶ 15. Dr. Gordon opined that Dr. McKenney perforated or injured the bowel during the laparoscopic cholysystectomy. He opined that, upon encountering dense bowel adhesions, Dr. McKenney should have converted from laparoscopy to open surgery, which would have decreased the risk of undetected injury to the bowel.
¶ 16. Dr. Gordon opined that Michael's post-operative bleeding came from bowel injuries. He opined that Dr. McKenney breached the standard of care by dissecting adhesions with the laparoscope. He testified that if Dr. McKenney had done a CT scan with contrast before April 9, he would have discovered the perforations when the contrast leaked from the bowel. Dr. Gordon testified that the abscesses discovered by Dr. Adkins on April 9 were old and well formed. He stated that it was impossible for pancreatitis to cause the abscesses to form. He stated that the pathology report on the perforated section of bowel revealed dead tissue, acute inflammation and granular tissue, which were consistent with the conclusion that perforations were eight days old. He stated that, because there is varying air within the bowel, the fact that no air was present on the April 9 CT scan did not mean that there were no perforations present at that time.
¶ 17. Two experts for Dr. McKenney opined that he did not breach the standard of care. Dr. Avery testified that a doctor does not breach the standard of care by lysing bowel adhesions during a laparoscopic cholysystectomy if necessary to perform the surgery. He opined that Dr. McKenney's lysis of adhesions was necessary to perform the surgery because the adhesions were in the operative field. Dr. Avery testified that bowel injuries do not cause substantial bleeding, and that Michael's post-operative bleeding most probably originated at the site of the gallbladder removal. He testified that a partial small bowel obstruction could be diagnosed by examining the bowel laparoscopically.
¶ 18. Dr. Avery further testified that the bowel could not have been perforated during the April 1 surgery because Michael *433 did not exhibit any symptoms of a bowel perforation. He testified that, if there was a perforation on April 1, Michael immediately would have developed an acute abdomen, in other words, an abdomen that is severely distended, hard, and extremely sensitive. He testified that Michael did not have an acute abdomen until April 9, when he was operated upon by Dr. Adkins. Dr. Avery testified that Michael's post-surgical symptoms were not of the sort that would have alerted a prudent physician to conduct a CT scan to check for bowel perforations before April 9.
¶ 19. Dr. Whigham averred that Dr. McKenney did not breach the standard of care. He stated that Michael's post-operative bleeding most probably came from the site of the gallbladder removal. He stated that Michael's post-operative condition was not symptomatic of a bowel perforation. He opined that Michael's bowel movements were a sign that he was recovering. He testified that the CT scan on April 9 would have shown free air in the abdomen if there had been a perforation. He testified that, because the CT scan did not show a perforation, the perforations probably did not occur until sometime after the CT scan. Dr. Whigham stated that the earliest the perforations could have occurred was on April 8. He stated that, had the perforations existed on April 1 and gone untreated until April 9, Michael would have become extremely ill and might have died.
¶ 20. Dr. Whigham testified that the bowel perforations were most probably caused by Michael's abdominal distension. He testified that the bowel may become distended to the point that the blood supply is cut off to a section of bowel. He testified that when the blood supply is cut off, the bowel tissue dies and perforations can occur. He stated that the pathology report on the perforated section of bowel showed dead tissue and, therefore, supported this theory of causation. He admitted that this process is extremely uncommon, but stated that it had been the cause of bowel perforations in two of his patients.
¶ 21. Dr. Whigham testified that Michael's abscesses were most probably caused by pancreatitis, which causes abdominal inflammation and can be a recurrent condition. He testified that Michael had developed pancreatitis after his 1992 bowel surgery. He stated that Michael's enzyme levels three weeks before the April 1 surgery indicated to a degree of medical probability that Michael suffered from pancreatitis that continued after the surgery and caused the abscesses to develop. Dr. Whigham stated that the complications Michael suffered were inherent risks of the gallbladder surgery.

LAW AND ANALYSIS

I. WAS THE EVIDENCE OF DR. MCKENNEY'S USE AND ABUSE OF ALCOHOL RELEVANT, PROBATIVE AND ADMISSIBLE?
¶ 22. The Griffin's first three arguments attack the trial court's admission or exclusion of evidence. On appeal, we review a trial court's admission or exclusion evidence for abuse of discretion. Terrain Enterprises v. Mockbee, 654 So.2d 1122, 1131 (Miss.1995). In assessing the trial court's exercise of discretion, we first inquire whether the trial court applied the correct legal standard. Pierce v. Heritage Properties, Inc., 688 So.2d 1385, 1388 (Miss.1997). If the lower court applied the correct legal standard, we must affirm absent "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors." Id. We will affirm if the trial court's decision was one of several reasonable decisions that could *434 have been made. Id. Further, if we find that an abuse of discretion occurred, we may reverse only if the error affected a substantial right of a party. M.R.E. 103.
¶ 23. The Griffins' first evidentiary argument is that the trial court improperly excluded evidence of Dr. McKenney's alcohol use. During discovery, the Griffins amended their complaint to allege that Dr. McKenney's judgment and skills were affected by alcoholism during his care of Michael. Dr. McKenney filed a motion in limine to exclude all evidence of his alcohol use.
¶ 24. In their response to Dr. McKenney's motion in limine, the Griffins itemized the evidence of Dr. McKenney's alcohol use. In his deposition, Michael asserted that he smelled alcohol on Dr. McKenney's breath at the pre-operative consultation. In her deposition, Angela testified that she smelled alcohol on Dr. McKenney when she spoke with him outside Michael's room on the night of the surgery.
¶ 25. In his deposition, Dr. McKenney stated that he received inpatient treatment for alcohol addiction in September 1999. He stated that before his alcoholism was treated, he would go long periods without drinking in an effort to control the problem. He admitted to having been an untreated alcoholic during the period of Michael's treatment and care, but he asserted that he consumed no alcohol during that period. Dr. McKenney stated he has never treated patients or performed surgery under the influence of alcohol.
¶ 26. Dr. McKenney admitted that, in September 1999, he was prevented from performing surgery at an Ocean Springs hospital when a nurse smelled alcohol on his breath and reported his condition to an administrator. He admitted that he lost his medical privileges at Ocean Springs due to that incident. He testified that Biloxi Regional Medical Center also suspended his medical privileges because of that incident. An administrator at Ocean Springs averred in an affidavit that he had been told by a Biloxi Regional administrator that Dr. McKenney's suspension from Biloxi Regional was due to a separate incident involving alcohol.
¶ 27. Dr. McKenney testified that the Ocean Springs incident led him to seek inpatient rehabilitative treatment for alcohol addiction, and that his privileges at both hospitals were reinstated once he completed the treatment. His explanation for the Griffins' detection of alcohol on his breath was that they might have smelled ketones. Dr. McKenney explained that ketones were chemicals produced by a low-carbohydrate diet he was on at the time that cause the breath to smell like alcohol.
¶ 28. The Griffins stated that their general surgery experts, Drs. Bagnato and Gordon, would testify that Dr. McKenney's alcoholism affected his professional skill and judgment in treating Michael. In his deposition, Dr. Gordon testified that Dr. McKenney's suspension and treatment for alcoholism in September 1999, along with the other evidence, indicated it was probable that Dr. McKenney had a serious problem with alcohol in April 1999. He stated that alcohol addiction does not develop overnight, and that Dr. McKenney's addiction probably built up over time until the Ocean Springs incident forced him to seek treatment. Dr. Gordon thought that the fact that Dr. McKenney could not be reached until nighttime on the day of the surgery raised a question of whether he was drinking after the surgery.
¶ 29. Dr. Bagnato stated that he "did not really focus" on whether any breach of the standard of care by Dr. McKenney was caused by his alcohol addiction. Dr. Bagnato stated that a decision to lyse adhesions *435 outside the operative field during gallbladder surgery "might be impaired judgment." The Griffins also cited deposition testimony by the Dr. McKenney's expert, Dr. Whigham, who stated that he did not think alcohol and the practice of medicine were compatible. He also stated that he had no knowledge of Dr. McKenney's alcohol addiction.
¶ 30. At a hearing prior to trial, the Griffins proffered the evidence of Dr. McKenney's alcohol use. In addition to the evidence related above, they proffered that two witnesses would testify that Dr. McKenney was prevented from treating one witness at Ocean Springs Hospital when the witness's husband smelled alcohol on Dr. McKenney and intervened. This incident occurred subsequent to Dr. McKenney's treatment of Michael.
¶ 31. In his motion in limine, Dr. McKenney presented corroborating evidence that he was not drinking during Michael's care. Carmen Nicholson testified that she did not smell alcohol on Dr. McKenney during the surgery. She stated that if she had detected that Dr. McKenney was under the influence of a substance she had a duty to report that fact to her superiors and would have done so. Another nurse, Mary Corley, testified that Dr. McKenney did not appear impaired in any way during the surgery. Novaline Dodson, also a nurse, testified that she had not detected alcohol on Dr. McKenney's breath during the surgery. Willard Gowdy, who administered Michael's anesthesia, testified that he did not smell alcohol on Dr. McKenney at the surgery. He testified that there was a reporting procedure that he would have followed had he perceived that Dr. McKenney was impaired. These witnesses also testified that they had never observed Dr. McKenney impaired at any time prior to the surgery.
¶ 32. At completion of discovery, the trial court granted Dr. McKenney's motion in limine in part. The court admitted all evidence that Dr. McKenney used alcohol when he consulted with, examined, or treated Michael. The court excluded any evidence of Dr. McKenney's alcohol use after his treatment of Michael and which occurred in a different city and at a different hospital. The court's reason for excluding the evidence was that it was irrelevant to Dr. McKenney's treatment of Michael, or, alternatively, that it was more prejudicial than probative because it would invite the jury to speculate from Dr. McKenney's subsequent acts that he acted improperly in Michael's case.
¶ 33. The Griffins filed a motion to reconsider, arguing that the evidence that Dr. McKenney admittedly suffered from the disease of alcoholism during his care of Michael should have been admissible under the court's order because the alcohol addiction existed during the doctor's care of Michael. In its order, the trial court held that the fact of Dr. McKenney's alcohol addiction during his care of Michael was not relevant because there was insufficient proof that Dr. McKenney was actually drinking during that period. The court alternatively held that the evidence was more prejudicial than probative. The result of the order was that the only admissible evidence of Dr. McKenney's alcohol use was Michael and Angela's assertions that they smelled alcohol on Dr. McKenney. The Griffins argue that the trial court's exclusion of the other evidence of Dr. McKenney's alcohol addiction was erroneous because the evidence was relevant and more probative than prejudicial.
¶ 34. We begin by addressing the trial court's relevancy determination. Mississippi Rule of Evidence 401 provides," `relevant evidence' means evidence having any tendency to make the existence of any fact *436 that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In the instant case, the Griffins argue that the fact that Dr. McKenney was admittedly addicted to alcohol during Michael's treatment was a fact of consequence because it tended to show that Dr. McKenney was impaired during the treatment and rendered negligent care. They also argue that they should have been able to use the evidence for impeachment purposes.
¶ 35. The trial court determined that the evidence of Dr. McKenney's alcoholism was irrelevant because it found insufficient proof that Dr. McKenney was actually drinking during Michael's care. This evidence was the deposition testimony of the operative staff who failed to detect any signs that Dr. McKenney was impaired, and the testimony of Dr. McKenney himself that he was not drinking in April. The court apparently decided that the evidence of the subsequent alcohol-related incidents did not tend to show that Dr. McKenney was drinking during Michael's care.
¶ 36. Our supreme court addressed the issue of admissibility of evidence of a doctor's substance abuse to show a breach of the standard of care and for impeachment purposes in the malpractice case of Sheffield v. Sheffield, 405 So.2d 1314 (Miss.1981). In that case, the plaintiffs alleged that the defendant physician negligently failed to diagnose a baby's post-delivery illness that resulted in the baby's death. Id. at 1315. When the plaintiffs deposed Dr. Sheffield, they discovered that he had a prior history of drug abuse. Id. Dr. Sheffield filed a motion in limine to exclude the evidence of his drug problem. Id. After a hearing, the court reserved its ruling on the issue but, at trial, it allowed the plaintiffs to thoroughly cross-examine Dr. Sheffield about his drug use. Id. at 1316. The testimony revealed that Dr. Sheffield had been abusing prescription drugs for several years prior to treating the baby. Id. He had received treatment for drug addiction, but later resumed abusing drugs. Id. Dr. Sheffield testified that he did not take drugs when he was treating the baby, and that he had not taken drugs for a month and a half prior to treating the baby. Id. There was testimony that another doctor complained to the state board about Dr. Sheffield's drug use, but that the complaint was not based on his treatment of the baby. Id.
¶ 37. The supreme court held that the trial court's admission of testimony about Dr. Sheffield's drug problem was error. Id. The court noted that the plaintiffs had never amended their complaint to charge that Dr. Sheffield was under the influence of drugs when he was treating the baby. Id. The court held that, since the drug abuse issue had not been stated in the complaint, the defendant should not have had to combat it at trial. Id.
¶ 38. The court also based its holding on the fact that there was no direct evidence that Dr. Sheffield was under the influence of drugs during his treatment of the baby. Id. The court stated that the evidence that Dr. Sheffield was not using drugs during the baby's treatment was uncontradicted. Id. The court cited Hundley v. St. Francis Hospital, 161 Cal.App.2d 800, 327 P.2d 131 (1958). Id. In that case, evidence was properly admitted that the defendant doctor had been abusing narcotics before and after the treatment period, and that his ability to operate was impaired. Id. at 1316-17. Distinguishing Hundley, the Sheffield court stated, "[w]e think [Dr. Sheffield's] previous history of drug abuse problems is too remote and disconnected with the negligence issue to be properly presented to the jury *437 in this case, therefore, retrial must be ordered." Id. at 1317. The court recognized that Dr. Sheffield properly could have been impeached by any evidence that he was using drugs during the baby's treatment or at the time he was testifying, had such evidence existed. Id.
¶ 39. While the Sheffield court stated that the plaintiff's case would have been in a better posture had they amended their complaint, the court's focus on the admissibility of the drug abuse evidence centered upon the tendency of the evidence to show that the defendant physician was actually impaired during his treatment of the plaintiff's baby. The court used the same approach in the recent case of Watson v. Chapman, 343 S.C. 471, 540 S.E.2d 484 (S.C.Ct.App.2000). In Watson, the Watsons alleged that the defendant doctor negligently delivered their baby prematurely, resulting in respiratory distress disorder. Id. at 486. They alleged in their complaint that Dr. Chapman's negligent care resulted from his substance abuse. Id.
¶ 40. The evidence showed that Dr. Chapman had been treated for alcohol dependency before he delivered the baby, and was readmitted for treatment less than one month after the baby's delivery. Id. at 487. Dr. Chapman admitted that he habitually drank on the weekends, and that he was drinking on the weekend prior to his delivery of the baby, but maintained that he was not drinking during his care of the baby. Id. He stated that his partners ousted him from the practice less than a month after the delivery because they were unhappy with "recent events." Id. Mr. Watson testified that Dr. Chapman appeared "enormously happy" during the delivery, and his sister-in-law, who worked with drug and alcohol addicts, testified that Dr. Chapman "acted like he was on drugs" at the hospital one or two days after the delivery. Id. at 488. Six witnesses who were in the operating room during the delivery testified on behalf of Dr. Chapman that he did not appear impaired at that time. Id.
¶ 41. The trial court found from the totality of the evidence that all the evidence of Dr. Chapman's alcohol addiction was relevant. Id. at 489. In its order, the trial court noted that, not only was Dr. Chapman treated for alcoholism, he admitted that he relapsed and drank the weekend before the delivery, and he was readmitted for inpatient treatment twenty-seven days after the delivery. Id. The Court of Appeals of South Carolina agreed, finding that the Watsons had presented sufficient evidence that Dr. Chapman was impaired at the time of the delivery to create a jury question. Id. at 487-88. The court also agreed with the trial court's holding that the evidence was more probative than prejudicial. Id.
¶ 42. As in Watson, in the instant case there was evidence that the defendant doctor was an alcoholic during the treatment period, and conflicting testimonial evidence of whether the doctor was actually drinking during the treatment. Unlike in Sheffield, in this case there was contradictory evidence on the question of whether or not the doctor was drinking during the plaintiff's treatment. We find that the evidence that Dr. McKenney was admitted for inpatient alcohol treatment and of subsequent incidents involving his attempted treatment of patients while under the influence of alcohol was certainly relevant. The evidence tended to show that Dr. McKenney was drinking during his treatment of the plaintiff, and along with the other evidence created a jury question. Therefore, the trial court's contrary finding was error.
¶ 43. We now turn to the trial court's alternative holding that the evidence *438 was more prejudicial than probative under Rule 403. To exclude relevant evidence under the rule, the trial court must find that potential prejudice to a party substantially outweighs the probative value of the evidence. Miss. Power and Light v. Lumpkin, 725 So.2d 721, 732-33 (¶ 55) (Miss.1998). The trial court must conduct on the record balancing of probative value and prejudice. Hageney v. Jackson Furniture of Danville, Inc., 746 So.2d 912, 920 (¶ 34) (Miss.Ct.App.1999). On appellate review of a lower court's application of Rule 403, we do not "engage anew in the 403 balancing process." Our review is limited to determining "whether the trial court abused its discretion in weighing the factors and admitting or excluding the evidence." Gen. Motors Corp. v. Jackson, 636 So.2d 310, 314 (Miss.1992).
¶ 44. In this case, the trial court found that, without more evidence that Dr. McKenney was drinking during Michael's treatment, the evidence of his alcoholism, subsequent rehabilitation and attempts to treat patients while under the influence of alcohol was more prejudicial than probative. The trial court found that the evidence would mislead the jury by inviting it to speculate from Dr. McKenney's subsequent acts that he acted improperly in Michael's treatment. We hold that the trial court acted within its discretion in so finding, though we may have held otherwise had there been more evidence that Dr. McKenney was drinking during Michael's treatment.[1] We recognize that the court did admit all of the direct evidence that Dr. McKenney was drinking during Michael's treatment.

II. DID THE TRIAL COURT IMPROPERLY ALLOW DR. MCKENNEY TO GIVE EXPERT TESTIMONY?
¶ 45. Dr. McKenney was designated as an expert witness pursuant to Mississippi Rule of Civil Procedure 26(b)(4). On April 16, 2001, McKenney's attorneys filed a notice of withdrawal of Dr. McKenney's expert designation. At trial, Dr. McKenney testified as a lay witness, and the plaintiffs objected to some of his testimony on the ground that it was expert testimony. On appeal, the Griffins argue that Dr. McKenney's testimony was impermissible expert testimony by a lay witness.
¶ 46. The reason for the different standards for lay and expert testimony is that expert testimony is subject to special discovery rules to "allow the opposing party ample opportunity to challenge the witness' qualifications to render such opinion before the question soliciting opinion is posed in front of the jury." Sample v. State, 643 So.2d 524, 530 (Miss.1994). To give expert testimony, a witness must be qualified and tendered as an expert. Roberson v. State, 569 So.2d 691, 696 (Miss.1990). At the time of trial, Rule 702 provided the following standard for admission of expert testimony. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness may testify thereto in the form of an opinion or otherwise."[2] Rule 701 states the standard for admission of lay opinions: "If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those which are (a) rationally based on the perception *439 of the witness and (b) helpful to the clear understanding of his testimony or the determination of a fact in issue." It has been stated that, "where, in order to express the opinion, the witness must possess some experience or expertise beyond that of the average, randomly selected adult, it is a Rule 702 opinion and not a Rule 701 opinion." Sample, 643 So.2d at 529-30.
¶ 47. The trial court held a bench conference after the plaintiffs objected to Dr. McKenney's testimony. The record reveals some confusion between the parties and the court as to what constituted expert testimony. The parties agreed that Dr. McKenney had been withdrawn as an expert witness and, therefore, could properly render lay testimony only. Dr. McKenney's counsel understood the permissible range of Dr. McKenney's testimony to include facts about his care and treatment of Michael, including the ability to explain why he rendered certain treatment. Counsel for Dr. McKenney understood that Dr. McKenney could not render opinions on the standard of care or whether his conduct met the standard of care. The Griffins argued that explanation of why certain treatments were rendered was expert testimony. The trial court agreed with the interpretation of Dr. McKenney's counsel, and limited his testimony accordingly. The Griffins objected to the trial court's interpretation of Rule 702.
¶ 48. On appeal, the Griffins contend that Dr. McKenney's testimony strayed into the area of expert testimony numerous times. The Griffins' first complaint is that the trial court allowed Dr. McKenney to list his educational background, training and experience as a general surgeon. Then, the Griffins cite seventeen instances of testimony that they consider expert. For example, they complain that Dr. McKenney described how the bowel goes to sleep for numerous reasons, described pancreatitis, elaborated on the risks of laparoscopic surgery, used medical drawings to illustrate Michael's surgery, described instruments used during the surgery, discussed reconnection of the bowel, described certain tests to detect blood in urine, discussed medicine to enhance bowel activity after surgery, explained the meaning of nurses' notes, and discussed the pros and cons of CT scans. The Griffins argue that they were prejudiced by this testimony because they had already dismissed the expert witnesses who could have rebutted the testimony.
¶ 49. Rule 702 states that expert testimony may be in the form of "opinion or otherwise." Therefore, expert testimony can include facts that are "scientific, technical or specialized knowledge" that "will assist the trier of fact to understand the evidence or to determine a fact in issue." A review of Dr. McKenney's testimony reveals that the testimony of which the Griffins complain was comprised of technical knowledge outside the range of knowledge of an ordinary layperson. However, Dr. McKenney was testifying as a treating physician who is also a party to the case. All the testimony of which the Griffins complain was part of Dr. McKenney's description of the surgery and of his care of Michael and was limited to that context. Dr. McKenney never offered an opinion on the standard of care.
¶ 50. We review the precedent on the situation where a treating physician, also a party, testifies as a lay witness. In Scafidel v. Crawford, 486 So.2d 370, 372 (Miss.1986), the court held that a treating physician could testify as a lay witness about the facts and circumstances surrounding the care and treatment of the patient. A treating physician may also describe what his records about the patient reveal. Id. The court also allowed a treating physician *440 to state opinions on what conditions the patient was suffering from if the opinion was acquired during the care and treatment of the patient, and if no evidence was presented to the jury of the significance of the condition. Id. This was because the lay jurors lacked medical training to assess how a medical condition may have been significant to the case. Id. In Foster v. Noel, 715 So.2d 174, 183 (¶ 53) (Miss.1998), the court followed Scafidel. In Foster, the court held that a treating physician rendered improper expert testimony when he opined that the patient's condition of depression was exacerbated by the defendant's alleged false arrest. Id. at (¶ 54). That testimony was improper because it informed the jury of the significance of the condition to the case. Id. Also pertinent is Langston v. Kidder, 670 So.2d 1, 4 (Miss.1995), where the court held that it was error for a party, not designated as an expert witness, to testify to industry standards and whether the defendant met those standards.
¶ 51. The aforementioned precedent indicates that the testimony complained of by the Griffins was permissible lay testimony by a treating physician who is a party to the case. The testimony was solely explanatory of Dr. McKenney's treatment of Michael and of his records and nursing records about Michael's care. However, some of Dr. McKenney's testimony on redirect examination is troublesome:
Q. All right. If there had been two perforations caused by you during your surgery of April 1st and you closed without repairing those two perforations, what kind of hospital course would you have expected to find during the time between April 1st and April 8th?
A. I would have expected to Mr. Griffin, first of all, very early to be putting out a lot of succus entericus, that is, bowel content, as well as blood from his drains. I would have expected an acute abdomen very early in the course.
Q. What is an acute abdomen?
A. An acute abdomen is an abdomen that is showing irritation of the peritoneal lining from a number of things. And the signs that are seen with irritation of the peritoneal lining are a rigid board-like abdomen, pain that cannot be  cannot be reduced with pain medication, before you get the patient lower than stage two, stage three in anesthesia, that is, they can't talk to you. As long as they're talking to you, their pain hasn't been reduced. Percussive tenderness. That is tenderness anywhere and everywhere on the abdomen as you tap on it. The patient can't possibly get up and walk around with an acute abdomen. In addition to a number of things, other physical findings of tachycardia. And that's an acute abdomen. The things that cause acute abdomen, things like gunshot wounds, perforation of an abscess. Acute appendicitis does in a localized area, in the right lower quadrant. Those are all things that are very evident, that are  that are obvious.
If Mr. Griffin had had two holes in his bowel that were left at the time I did the operation, he would have very early on, in the first couple of days after surgery, have been draining contents of his intestines out into the peritoneal cavity. He would have a complete ileus. His bowel would stop moving. He would have an absolutely quiet abdomen that was rigid, that had pain that could not be relieved. This wouldn't  this is not a subtle finding. That is, everyone, anyone, certainly myself, would have been able to tell you that he had an acute abdomen.
¶ 52. Dr. McKenney went on to testify that Michael's white blood count would have been double what is normal. He *441 opined that, if bowel content had been draining into the abdomen, Michael most probably could not have had bowel movements on April 7. He opined that Michael had no symptoms of developing abscesses and stated what those symptoms would have been.
¶ 53. Though Dr. McKenney never opined as to the standard of care, the above testimony was clearly impermissible expert testimony under Scafidel and Foster. A major issue in this case was when and how Michael's bowel was perforated. The trial court allowed Dr. McKenney, a lay witness, to opine as to the symptoms Michael would have presented had the bowel been perforated during the April 1 surgery. Those opinions were within the ambit of Rule 702. Other testimony revealed that Michael did not present the symptoms described by Dr. McKenney and, therefore, Dr. McKenney's impermissible expert testimony assisted the defense. The Griffins had preserved an objection to Dr. McKenney's testimony. The trial court erred by allowing Dr. McKenney's testimony to stray into the realm of expert testimony.
¶ 54. We have held that strict compliance to the requirements of expert discovery is necessary "to prevent trials from being tainted with surprise and unfair advantage." Nonetheless, we find that the error in this case does not warrant reversal. Dr. McKenney's expert testimony was largely cumulative of that of his expert witnesses, Drs. Avery and Whigham. See Scafidel, 486 So.2d at 372. As Dr. McKenney's testimony presented no new information, we cannot envision how the Griffins would have altered their approach to the trial had Dr. McKenney been properly designated as an expert. See Foster, 715 So.2d at (¶ 54). Dr. McKenney's testimony did not substantially prejudice the Griffins. Therefore, this issue is not grounds for reversal. M.R.E. 103.

III. DID THE TRIAL COURT ERR IN EXCLUDING A STATEMENT BY DR. ADKINS?
¶ 55. Nurse Carmen Nicholson, in addition to assisting in Michael's April 1 surgery by Dr. McKenney, assisted in the April 9 surgery when Dr. Adkins discovered Michael's bowel perforations and numerous abscesses. In her deposition, Nurse Nicholson stated that when Dr. Adkins discovered bowel content leaking into Michael's abdominal cavity Dr. Adkins exclaimed, "that stupid son-of-a-bitch!" in reference to Dr. McKenney. Dr. McKenney filed a motion in limine to exclude Dr. Adkins' statement on the ground that it was impermissible hearsay. The Griffins argued the statement was excepted from the hearsay rule either as an excited utterance or as a present sense impression. The trial court granted the motion. The Griffins contend the ruling was prejudicial error because "it would have been of considerable weight for the jury to know that Dr. McKenney's own partner was critical of his handiwork."
¶ 56. The record reveals that the trial court's exclusion of the statement was based on two alternative grounds. Firstly, the court found that the statement constituted impermissible hearsay. Secondly, the court found that admission of the statement would violate the court's order barring expert testimony from Dr. Adkins because of a discovery violation committed by Dr. McKenney's counsel.
¶ 57. We review a trial court's exclusion of evidence based on its ruling on a discovery violation for abuse of discretion. During discovery, the Griffins moved for a protective order, alleging that counsel for Dr. McKenney engaged in improper ex parte contact with Dr. Adkins, one of *442 Michael's treating physicians. The trial court held a hearing on the motion. The Griffins argued that, under the rule articulated in Scott v. Flynt, 704 So.2d 998, 1004-05 (Miss.1996), defense counsel should not communicate ex parte with the plaintiff's treating physician because of the danger that the treating physician would inadvertently disclose information protected by the patient-physician privilege, a privilege that can only be waived by the patient. Counsel for Dr. McKenney confessed that further ex parte communication with Dr. Adkins would be improper under Scott, and the court entered a protective order prohibiting ex parte communication with Michael's treating physicians.[3]
¶ 58. Later, the Griffins moved for enforcement of the protective order. The Griffins complained that, prior to their deposition of Dr. Adkins, Dr. McKenney's counsel sent Dr. Adkins a letter with a copy of Dr. McKenney's deposition and of Dr. McKenney's expert designation. The Griffins asserted that the communication influenced the deposition testimony of Dr. Adkins, who was a member of Dr. McKenney's surgical group and shared the same malpractice insurer. At a hearing on the matter, the trial court reserved ruling due to the absence of counsel for Dr. McKenney, but barred defense counsel from communicating ex parte with Michael's treating physicians pending resolution of the issue. A few days later, defense counsel sent information to Dr. Martin, another of Michael's treating physicians.
¶ 59. The court held that defense counsel had violated the protective order. The court therefore prohibited the parties from eliciting the opinions of Dr. Adkins and Dr. Martin on whether or not Dr. McKenney's conduct breached the standard of care. The court further held that, if the plaintiffs elicited expert testimony from the doctors at trial, they would open the door to standard of care questions by defense counsel.
¶ 60. At trial, the Griffins proffered that Nurse Nicholson would testify that Dr. Adkins exclaimed "that stupid son-of-a-bitch!" when he opened Michael's abdomen, and that the statement referred to Dr. McKenney. The trial court stated that it considered the proffer "an attempt to basically back door expert testimony," and noted that the Griffins had expressly refused to elicit expert testimony from Dr. Adkins during his earlier testimony. On appeal, the Griffins admit that the "stupid son-of-a-bitch" statement expressed Dr. Adkins' opinion on the quality of care rendered by Dr. McKenney. Thus, they admit that the statement constituted Dr. Adkins' expert opinion. The trial court acted within its discretion in excluding the statement based on its prior ruling excluding expert testimony by Dr. Adkins, and on the plaintiff's declination to open the door to expert testimony by Dr. Adkins. As we find that the court acted well within its discretion in excluding Dr. Adkins' statement on this ground, we do not address the hearsay question.

IV. DID THE TRIAL COURT ERR IN GRANTING JURY INSTRUCTION D-4(A)(M)(2) REGARDING MEDICAL NEGLIGENCE?
¶ 61. The Griffins aver that they are entitled to a new trial because of three erroneous jury instructions. The first instruction challenged by the Griffins instruction stated that, before the Griffins *443 could establish medical negligence against the Dr. McKenney, they must have proved by a preponderance of the evidence:
that the Defendant McKenney committed medical negligence in the manner in which he performed surgery upon Mr. Griffin or by deciding to perform lysis of abdominal adhesions during the gall bladder surgery on Michael Griffin of April 1, 1999, to a greater extent than was reasonably necessary within the standard of care, which proximately caused or contributed to perforations in the Plaintiff's bowel, and that such medical negligence, if any, proximately caused or contributed to disease or damage to the Plaintiff's bowel, requiring surgery by Dr. Adkins on April 9, 1999 and subsequent medical treatment. If the Plaintiff fails to establish either of the foregoing, then you are instructed as a matter of law that the Plaintiff has not established liability against the Defendant based upon such allegations of medical negligence.
The Griffins argue that the trial court erred by granting one of Dr. McKenney's negligence instructions because the instruction failed to state that the Griffins could establish negligence by proving that Dr. McKenney negligently rendered post-operative care.
¶ 62. On review of the trial court's grant or denial of jury instructions, we read the instructions actually given as a whole to determine whether the jury has been incorrectly instructed. Haggerty v. Foster, 838 So.2d 948, 953 (¶ 4) (Miss.2002). If the instructions, read as a whole, fairly announce the law of the case and create no injustice, there is no reversible error. Id.
¶ 63. Examining the jury instructions given, we find that another instruction stated that if the jury found by a preponderance of the evidence that Dr. McKenney was negligent in regard to "failing to discover and repair bowel perforations during the surgery and in failing to properly follow-up, diagnose and treat bowel perforations and infection in the days following surgery," and that the negligence proximately caused Michael's injuries, it could find for the Griffins. Viewing the instructions as a whole, the jury was properly instructed that it could find for the Griffins on the ground that Dr. McKenney rendered negligent post-operative care. This issue is without merit.

V. DID THE TRIAL COURT ERR IN GRANTING JURY INSTRUCTION D-5(A)(M) REGARDING CAUSATION OF THE BOWEL PERFORATIONS AND ABSCESSES?
¶ 64. Another jury instruction stated, in part, that if the jury found that the abscesses and perforations discovered on April 9 were the result of a disease process and were not caused by medical negligence of Dr. McKenney, then Dr. McKenney was not guilty of medical negligence in having caused the abscesses and perforations. The Griffins argue that the instruction was error because there was no evidence that Michael's perforations and abscesses were caused by a disease process. Dr. Whigham, testifying for Dr. McKenney, stated that Michael's abscesses were most probably caused by "the disease of pancreatitis," and that his bowel perforations were caused by a process whereby the bowel "undergoes necrosis and gangrene and perforation" when its blood supply is restricted. We find that the instruction was supported by the evidence and was not erroneous.

VI. DID THE TRIAL COURT ERR IN GRANTING JURY INSTRUCTION D-13(M) REGARDING INFORMED CONSENT?
*444 ¶ 65. The Griffins next argue that Dr. McKenney's informed consent instruction was an improper statement of law. The Griffins also instructed the jury on informed consent. The Dr. McKenney's instruction stated:
The Court instructs the jury that the Plaintiffs have charged that the Defendant was negligent in the lack of informed consent to the Plaintiff Michael Griffin for surgery. If you find from the evidence that the Defendant McKenney, prior to surgery, in his discussions with the Plaintiff and in the consent for surgery signed by the Plaintiff prior to surgery, reasonably advised the plaintiff of the risks of bowel injury and the possibility of unanticipated surgery which would have been material to a prudent patient in determining whether or not to undergo the surgery identified in the "informed consent for surgery" form, then in that event, the Plaintiffs have failed to prove that the Defendant was negligent for lack of informed consent of Plaintiff Griffin for surgery.
¶ 66. The evidence of informed consent was that, on March 31, Michael signed an "informed consent for surgery form" authorizing Dr. McKenney to perform a laparoscopic cholysystectomy. The form acknowledged that the physician had advised the patient of the risks and complications of the procedure. The form also authorized "the performance of such additional surgeries and procedures (whether or not arising from presently unforeseen conditions) considered necessary or desirable in the judgment of my doctor or those of the hospital's medical staff who serve me." Dr. McKenney testified that during a pre-surgical consultation with the Griffins he informed them that the surgery entailed a risk of injury to the intestine, and that he would repair any intestinal injuries during the surgery. He further testified that his office note from the date of the consultation stated that he informed Michael of the risks, alternatives and possible complications of the surgery. Michael testified that he did not recall that Dr. McKenney mentioned any risks of laparoscopic cholysystectomy during the consultation.
¶ 67. The Griffins argue the informed consent instruction was erroneous because it allowed the jury to consider whether Michael was advised of the risks of bowel injury through the "informed consent to surgery" form. The Griffins contend that, under Mississippi Code Annotated section 41-41-7 (Rev.2001), the form's authorization clause for "the performance of such additional surgeries and procedures ... considered necessary or desirable" in fact authorizes only those procedures the physician considers immediately necessary due to an emergency situation. The Griffins argue that the authorization clause did not constitute consent to allow Dr. McKenney to lyse adhesions or perform the bowel resection because no emergency situation arose during the surgery.
¶ 68. Mississippi Code Annotated section 41-41-7 (Rev.2001) provides:
In addition to any other instances in which a consent is excused or implied at law, a consent to surgical or medical treatment or procedures, suggested, recommended, prescribed or directed by a duly licensed physician, will be implied where an emergency exists if there has been no protest or refusal of consent by a person authorized and empowered to consent or, if so, there has been a subsequent change in the condition of the person affected that is material and morbid, and there is no one immediately available who is authorized, empowered, willing and capacitated to consent. For the purposes hereof, an emergency is defined as a situation wherein, in competent medical judgment, the proposed *445 surgical or medical treatment or procedures are immediately or imminently necessary and any delay occasioned by an attempt to obtain a consent would reasonably jeopardize the life, health or limb of the person affected, or would reasonably result in disfigurement or impairment of faculties.
¶ 69. The Griffins are incorrect that section 41-41-7 renders an informed consent clause ineffective absent an emergency situation. The statute states that consent will be implied in emergency situations "in addition to any other instances in which a consent is excused or implied at law." In Mississippi, consent to a medical procedure may be implied when a patient is fully informed of the known risks that would be material to a prudent patient in determining whether to undergo the proposed treatment. Herrington v. Spell, 692 So.2d 93, 98 (Miss.1997). Thus, for consent, no emergency need exist as long as the patient was informed that the procedure was a known risk of the proposed treatment. Dr. McKenney presented expert testimony that injury to the bowel and the necessity of performing a bowel resection are known risks of a laparoscopic cholysystectomy. Dr. McKenney testified that he informed Michael of these risks, and Michael signed the informed consent form. The informed consent instruction did not misstate the law, and it was supported by the evidence.

VII. DID THE TRIAL COURT ERR IN INFORMING THE JURY THAT A PHYSICIAN IS NOT LIABLE FOR A MERE ERROR OF JUDGMENT?
¶ 70. During voir dire, the trial court informed the jury panel that this was a medical malpractice case and noted several characteristics of a medical malpractice claim. Among the court's remarks was the statement, "[a] competent physician is not automatically liable for a mere error of judgment, mistake in diagnosis, or the occurrence of an undesirable result." It is undisputed that Mississippi no longer adheres to the "mere error of judgment" standard and that the trial court misstated the law. See Day v. Morrison, 657 So.2d 808, 815 (Miss.1995). In fact, the parties immediately brought the error to the court's attention and a bench conference was held.
¶ 71. After the bench conference, the trial court informed the panel that the court's remarks "were simply general instructions for you" and that the "exact law, through jury instructions, will be given to you at the conclusion of the case." The court stated that at the conclusion of trial the jury instructions would be read aloud and that the jury would be allowed to take them into the jury room during deliberations. The court then asked the panel if it understood and agreed to follow the instructions of law that would be given at the conclusion of the case, and not the general instructions that the court had read. The transcript indicates that the panel nodded in agreement.
¶ 72. The Griffins argue that the trial court's mistake erroneously instructed the jury and that they are entitled to a new trial. We find that this issue is without merit. In Day, the supreme court held that a jury instruction articulating the "mere error of judgment" standard misstates the law and constitutes reversible error. Id. at 815. Unlike in Day, in the instant case, the court communicated the erroneous standard as part of voir dire remarks, not through a formal jury instruction. Further, moments after the mistake was made, the court specifically instructed the jury to disregard all of its voir dire comments on the law and to rely solely on the formal jury instructions. The jury indicated that it understood. *446 Most importantly, the formal jury instructions, taken as a whole, properly stated the law of this case. "An instructional error will not warrant reversal if the jury was fairly and fully instructed by other instructions." Coleman v. State, 804 So.2d 1032, 1038 (¶ 27) (Miss.2002) (quoting Collins v. State, 594 So.2d 29, 35 (Miss.1992)). The trial court's error does not demand reversal.

VIII. WAS THE VERDICT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
¶ 73. The Griffins filed a motion for a new trial, arguing that the verdict was against the overwhelming weight of the evidence. The trial court denied the motion. On appeal, the Griffins assert that there was a failure of evidence supporting the defense theories of causation. They argue that they are entitled to a new trial.
¶ 74. The grant or denial of a motion for a new trial is a matter within the trial court's sound discretion. Green v. Grant, 641 So.2d 1203, 1207 (Miss.1994). On appeal, we may reverse only when the trial court has abused its discretion. Id. In evaluating the trial court's decision, we review the credible evidence in the light most favorable to the non-moving party, and generally take the credible evidence supporting the claims or defenses of the non-moving party as true. Id. When the evidence is so viewed, we will reverse only when, upon review of the entire record, we are left with a firm and definite conviction that the verdict, if allowed to stand, would work a miscarriage of justice. Id. at 1207-08.
¶ 75. We note that, in a medical malpractice case, the plaintiff has the burden of proof to show that the defendant physician breached the standard of care. In McCaffrey v. Puckett, 784 So.2d 197, 206 (¶ 33) (Miss.2001), the court stated, "[t]o prove a prima facie case of medical malpractice, the plaintiff (1) after establishing the doctor-patient relationship and its attendant duty, is generally required to present expert testimony (2) identifying and articulating the requisite standard of care and (3) establishing that the defendant physician failed to conform to the standard of care. In addition, (4) the plaintiff must prove the physician's noncompliance with the standard of care caused the plaintiff's injury, as well as proving (5) the extent of the plaintiff's damages."
¶ 76. The Griffins argue that the evidence and expert testimony was such that the jury could only find that Dr. McKenney caused Michael's bowel injuries because he breached the standard of care. We disagree. The Griffins' general surgery experts testified to a reasonable degree of medical probability that on April 1, Dr. McKenney perforated or injured the bowel such that perforations developed. They testified that, while a physician does not breach the standard of care by accidentally perforating the bowel during gallbladder surgery, a physician does breach the standard by lysing adhesions outside the operative field, thus creating an unnecessary risk of perforation, or by failing to notice and repair any perforations caused prior to closing the surgery. They also testified that Michael's post-surgical symptoms would have alerted a reasonably prudent, minimally competent physician to the probability of bowel perforations.
¶ 77. Dr. McKenney's general surgery experts testified to a reasonable degree of medical probability that the perforations could not have occurred before April 8 or 9. The experts testified that Dr. McKenney lysed only those bowel adhesions that were in the operative field and necessary to perform the gallbladder surgery. Dr. Avery stated that Michael *447 would have exhibited an acute abdomen before April 9 had the perforations been caused on April 1. Dr. Gordon testified that Michael would have been dangerously ill or dead by April 9 had the perforations been caused on April 1. Dr. Whigham testified that it was medically probable that the perforations were caused when, due to intestinal distension, the blood supply to the bowel was cut off and the bowel tissue died. Dr. Whigham further testified that Michael had pancreatitis during the post-operative period that probably caused the abdominal abscesses that were well-formed by April 9. Both experts opined that Michael's post-surgical symptoms were largely inconsequential and would not have led a reasonably prudent, minimally competent physician to suspect bowel perforations.
¶ 78. It is the province of the jury to weigh the evidence. Dr. McKenney's experts testified that Dr. McKenney did not breach the standard of care, and offered theories based on a reasonable degree of medical probability as to how Michael's injuries developed. We find that the evidence was such that the jury could reasonably find that the Griffins failed to prove by a preponderance of the evidence that Dr. McKenney damaged Michael's bowel. This issue is without merit.
¶ 79. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS/CROSS-APPELLEES AS TO THE DIRECT APPEAL. THE ISSUES ON CROSS-APPEAL ARE RENDERED MOOT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, MYERS AND GRIFFIS, JJ., CONCUR. IRVING, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.
NOTES
[1] The Griffins posit a compelling argument that the fact of Dr. McKenney's contemporaneous alcohol addiction, without more, was relevant because alcoholism is a disease that generally impacts veracity and judgment; however, the argument lacks merit because it was unsupported by testimony of a qualified expert on alcohol addiction. M.R.E. 702.
[2] Rule 702 has been amended effective May 29, 2003.
[3] We express no opinion on the parties' reading of Scott, which in fact states that a defendant is not prohibited from speaking ex parte with a plaintiff's physician without the plaintiff's consent, but that information divulged by such communication is inadmissible. Scott, 704 So.2d at 1006.