# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CA-00051-SCT

*CHARLES ROBINSON, M.D.*

*v.*

*REGINA A. CORR*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/01/2014 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| TRIAL COURT ATTORNEYS: | BRETT K. WILLIAMS |
| | JOSHUA WESLEY DANOS |
| | JOE SAM OWEN |
| | ROBERT P. MYERS, JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | BRETT K. WILLIAMS |
| | JAMES E. LAMBERT, III |
| | JOSHUA WESLEY DANOS |
| ATTORNEYS FOR APPELLEE: | JOE SAM OWEN |
| | ROBERT P. MYERS, JR. |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 04/14/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., KING AND MAXWELL, JJ.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Regina Corr sued Dr. Charles Robinson for medical malpractice. The jury awarded Regina $55,634.78 for past medical expenses and $420,000 for pain and suffering. Dr. Robinson filed motions for judgment notwithstanding the verdict and for remittitur, which the trial court denied. On appeal, Dr. Robinson argues that the trial court erred in excluding

his proffered testimony, in admitting testimony from Regina's expert that was outside her expert's designation, and in denying his request for a remittitur. Finding no error, we affirm the judgment of the Harrison County Circuit Court.

## FACTS AND PROCEDURAL HISTORY

¶2.     In July 1998, Regina Corr went to the Gulfport Memorial Hospital to give birth to her fourth child. Her obstetrician/gynecologist ("OB/GYN"), Dr. Charles Robinson, decided to deliver Regina's child via Caesarean section ("C-section"). During the C-section, Regina's uterus was lacerated and required surgical repair. Dr. Robinson began placing sutures in the lacerated uterus to bring the torn sides together. According to Dr. Robinson, the uterine tissue he was attempting to repair was friable, which means it pulls apart easily and is difficult to stitch. He described the process as trying to stitch hamburger meat.

¶3.     Dr. Robinson had tried to remove the ureter [1] from the area he was suturing, which was in close proximity to the laceration in the uterus, and he believed he had done so. From the C-section and lacerated uterus, Dr. Robinson estimated Regina's intraoperative blood loss was between 800-900 milliliters. Once hemostasis (i.e., stoppage of the bleeding) was achieved, Dr. Robinson closed the surgery. He ordered an IVP[2] for the next morning out of concern for compromised ureter integrity from hematoma, blood-clot, and a possible kinking

---

[1] Ureters are tubes which serve as channels for urine to pass from the kidney to the urinary bladder.

[2] An IVP (intravenous pyelogram) is a procedure by which dye is inserted into the body and travels through the ureters, eventually emptying into the bladder. X-rays are then taken to determine whether there is some obstruction in the ureters.

2

of the ureter, among other things. The IVP was performed, and the results showed a partial obstruction of Regina's left kidney.

¶4. Dr. Robinson then ordered a consultation by Dr. Thad Carter, an urologist, who performed a cystoscopy and visually examined the ureter with a urethroscope. Dr. Carter then discovered that the left ureter was sutured. Dr. Carter was unable to alleviate the obstruction due to the suture, so he placed a nephrostomy tube to drain the urine from the blockage into a nephrostomy bag. The nephrostomy tube is intended to allow the ureter to heal from the obstruction. Regina later sought treatment from another urologist who inserted ureter stents to widen the blocked area until the blockage had dissipated. Regina had no further complaints after mid-May 1999.

¶5. In May 2000, Regina sued Dr. Robinson, alleging medical malpractice. She claimed that, during the laceration repair, Dr. Robinson negligently sutured (or placed a suture very near) the ureter, which resulted in blockage, and that he failed to keep Regina open on the table to remove any discovered blockages. Discovery progressed and numerous depositions were taken. During his July 2001 deposition, Dr. Robinson denied suturing the left ureter, and his position never changed until the day of opening statements at trial.

¶6. In May 2003, Regina designated, among others, Dr. Fred Duboe, an OB/GYN, to testify as to the standard of care and causation. In July 2014, Dr. Robinson filed his Second Supplemental Designation of Experts, which identified himself as an expert in the field of obstetrics and gynecology.

¶7. Trial began in September 2014. In pretrial motions, Dr. Robinson's counsel raised objections to portions of the trial deposition testimony of Regina's expert, Dr. Duboe, based on nonresponsiveness of some of his answers, and as being beyond the scope of Dr. Duboe's expert designation and expertise. Specifically, Dr. Robinson's counsel moved to exclude Dr. Duboe's testimony that Dr. Robinson had "overestimated" Regina's blood loss, based on his review of the medical records and his evaluation of her hemoglobin levels in the days after the surgery. The trial court overruled these objections and allowed the testimony to go before the jury, finding that Dr. Duboe was responding to a direct question posed by Dr. Robinson's counsel, among other reasons.

¶8. During his opening statement, Dr. Robinson's counsel, for the first time, stated that Regina's blood loss was a factor in Dr. Robinson's decision to conclude the surgery, rather than investigate and repair the ureter. Dr. Robinson's counsel also stated that it would have been life-threatening to keep Regina open on the table to investigate and repair the obstruction.

¶9. Regina filed and argued a motion in limine to exclude this testimony of Dr. Robinson–that, due to the friability of the tissue he was suturing, and the amount of blood loss from the delivery and laceration, he would not have removed any stitches for fear of causing uncontrollable bleeding. The trial court ruled that the basis of Dr. Robinson's decision to close the surgery was an expert opinion which had not been disclosed, so the trial court sustained Regina's motion to exclude it. In its ruling, the trial court stated, "I don't disagree that Dr. Robinson can testify to what was in his mind at the time that he was

4

performing the procedure. However, that has to have been disclosed as part of discovery, whether it was by answers to interrogatories, or by deposition."

¶10. Later during the trial, Dr. Robinson again tried to proffer testimony that he would not have attempted to remove the suture if he had known of its existence due to the friable tissue and potential bleeding. The trial court found such testimony should have been disclosed and that the proffered testimony was highly speculative and made in hindsight, as it was an opinion that was acquired after the surgical procedure had ended.

¶11. Testimony also was offered as to Regina's injuries and medical treatment. Medical bills totaling $55,634.78 were admitted into evidence by stipulation of the parties and without objection. Regina testified as to her injuries, medical care, and her pain and suffering as a result of the procedure. Brian Corr, Regina's husband, also testified.

¶12. The jury awarded $55,634.78 in past medical expenses, lost wages of $8,507.20, and $420,000 for pain and suffering. Dr. Robinson filed a motion for a judgment notwithstanding the verdict (JNOV), motion for remittitur, or in the alternative, motion for new trial. The trial court denied Dr. Robinson's motions. Dr. Robinson appeals and raises the following issues: (1) whether the trial court abused its discretion in preventing Dr. Robinson from testifying that he would not have removed the stitch in Regina's ureter during surgery, because of Regina's blood loss and friability of the stitched tissue, (2) whether the trial court abused its discretion in allowing Regina's expert, Dr. Duboe, to testify beyond his expert designation and outside his field of expertise, that Regina's post-surgery hemoglobin levels indicate Dr.

5

Robinson overestimated Regina's blood loss, and (3) whether the trial court committed reversible error in refusing to grant Dr. Robinson's motion for remittitur.

## ANALYSIS

I. **Whether the trial court abused its discretion in preventing Dr. Robinson from testifying that he would not have removed the stitch in Regina's ureter during surgery, because of Regina's blood loss and friability of the stitched tissue.**

*A. Whether Dr. Robinson's testimony was an expert opinion.*

¶13. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . . ." M.R.E. 702. If the witness is offering lay testimony, and not an expert opinion, such testimony is confined to "opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to the clear understanding of the testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." M.R.E. 701.

¶14. In some cases, the line between expert opinion and lay opinion can be blurred. For example, there are situations where a doctor, who also is a treating physician and a party to the case, may testify as a lay witness. This Court addressed such a scenario in *Scafidel v. Crawford*, 486 So. 2d 370 (Miss.1986), in which a patient sued her doctor for failing to diagnose and treat a pelvo-abdominal mass. *Id.* at 371. The doctor's testimony described the facts and circumstances surrounding his care and treatment of the patient. *Id.* at 372. The doctor stated that, during his treatment, he discovered the patient was anemic. *Id.* But the

6

doctor did not offer an opinion as to the effect of anemia. *Id.* The patient argued that the doctor's testimony that she was anemic was an expert opinion and not fact testimony. *Id.* She also argued it should have been excluded because the doctor was not listed as an expert and the substance of his opinions was not disclosed. *Id.*

¶15.    This Court in *Scafidel* held that the doctor, as a fact witness, did not cross the line between fact testimony and expert opinion when he stated that the patient was anemic. *Id.* This Court found the opinion was acquired through the care and treatment of the patient *during* the illness. *Id.* (emphasis added). The doctor could testify that the patient was anemic without becoming an expert witness, just as he had testified that the patient had fever, chills, and diarrhea. *Id.* Importantly, "no evidence was presented to the jury of the significance of this condition." *Id.*

¶16.    Another instructive case about the testimony of a treating physician who also was a party to the case is *Griffin v. McKenney*, 877 So. 2d 425 (Miss. Ct. App. 2003). At issue in *Griffin* was whether the trial court improperly allowed the doctor to give expert testimony. *Id.* at 438. The doctor had performed gallbladder surgery on the patient, and the patient had suffered many complications after the surgery. *Id.* The patient sued the doctor for malpractice, alleging that he negligently had perforated the bowel and had failed to timely diagnose and treat the perforation. *Id.* at 430-31. The doctor denied perforating the bowel during surgery and argued that the perforations occurred in the days after the surgery. *Id.* The doctor initially was designated as an expert witness, but he later was withdrawn, and the parties agreed that he could render only lay testimony. *Id.* at 439.

7

¶17.    The patient in *Griffin* argued that the doctor's testimony strayed into the area of expert testimony. *Id.* For example, the doctor:

> described how the bowel goes to sleep for numerous reasons, described pancreatitis, elaborated on the risks of laparoscopic surgery, used medical drawings to illustrate Michael's surgery, described instruments used during the surgery, discussed reconnection of the bowel, described certain tests to detect blood in urine, discussed medicine to enhance bowel activity after surgery, explained the meaning of nurses' notes, and discussed the pros and cons of CT scans.

*Id.*

¶18.    The Court of Appeals found that such testimony "was comprised of technical knowledge outside the range of knowledge of an ordinary layperson." *Id.* The Court of Appeals, though, held he "was testifying as a treating physician who is also a party to the case . . . [and that the] description of the surgery and of his care . . . was limited to that context . . . [and that he] never offered an opinion on the standard of care." *Id.* at 439. But the Court of Appeals held that the doctor's following testimony was impermissible:

> Q. All right. *If there had been* two perforations caused by you during your surgery of April 1st and you closed without repairing those two perforations, what kind of hospital course would you have expected to find during the time between April 1st and April 8th?
>
> A. *I would have expected to Mr. Griffin, first of all, very early to be putting out a lot of succus entericus, that is, bowel content, as well as blood from his drains. I would have expected an acute abdomen very early in the course.*
> . . .
>
> *If Mr. Griffin had had two holes in his bowel that were left at the time I did the operation, he would have very early on, in the first couple of days after surgery, have been draining contents of his intestines out into the peritoneal cavity*. He would have a complete ileus. His bowel would stop moving. He would have an absolutely quiet abdomen that was rigid, that had pain that could not be relieved. This wouldn't–this is not a subtle finding. *That is,*

8

*everyone, anyone, certainly myself, would have been able to tell you that he had an acute abdomen.*

*Id.* at 440 (emphasis added).

¶19.    The doctor also testified that the patient's "white blood count would have been double what is normal." *Id.* He "opined if bowel content had been draining into the abdomen, Michael most probably could not have had bowel movements on April 7. He opined that Michael had no symptoms of developing abscesses and stated what those symptoms would have been." *Id.* at 441.

¶20.    The Court of Appeals held that, even though the doctor "never opined as to the standard of care, the above testimony was clearly impermissible expert testimony under *Scafidel* and *Foster*." *Id. See Foster v. Noel*, 715 So. 2d 174, 183 (Miss. 1998). The Court of Appeals noted that the trial court allowed the doctor, a lay witness, to offer opinions within the scope of Rule 702 as to the symptoms his patient would have presented had the bowel been perforated during surgery. *Id.*[3] Other testimony showed that the patient did not present the symptoms described by the doctor, so the doctor's "impermissible expert testimony assisted the defense . . . [and] [t]he trial court erred by allowing Dr. McKenney's testimony to stray into the realm of expert testimony." *Id.*[4]

---

[3] The Court of Appeals, though, found the error did not warrant reversal, as the treating physician's "expert testimony was largely cumulative of that of his expert witnesses . . . ." *Id.* (citing *Scafidel*, 486 So. 2d at 372). Since the doctor's testimony presented no new information, the Court of Appeals noted the patient could not have altered his trial strategy had the doctor been properly designated as an expert. *Id.* (citing *Foster*, 715 So. 2d at 183). "Dr. McKenney's testimony did not substantially prejudice the Griffins." *Id.*

[4] *See also **Weese v. Schukman***, 98 F. 3d 542, 550 (10th Cir. 1996) (holding that a treating or defendant physician may offer lay opinion testimony, consistent with Rule 701,

¶21. Dr. Robinson's counsel argues that, here, Dr. Robinson was prevented from explaining his treatment of Regina. The proffered testimony Dr. Robinson tried to submit before the jury is as follows:

> Counsel for Dr. Robinson ("Counsel"): You attempted to stitch and you did stitch the uterus?
>
> Dr. Robinson: Yes.
>
> Counsel: The uterus was friable?
>
> Dr. Robinson: Yes.
>
> Counsel: And there was significant bleeding?
>
> Dr. Robinson: Yes.
>
> Counsel: Doctor, as we sit here today under any circumstance would you have removed that stitch after you obtained hemostasis while Mrs. Corr was on the operating room table?
>
> Dr. Robinson: Which stitch?
>
> Counsel: The stitching of the uterus?
>
> Dr. Robinson: In the ureter.
>
> Counsel: Ureter.

---

when the opinion is "based on his experience as a physician and . . . [is] clearly helpful to an understanding of his decision making process in the situation."); **Williams v. Mast Biosurgery USA, Inc.**, 644 F. 3d 1312, 1317-18 (11th Cir. 2011) (citing **Weese** with approval but cautioning that **Weese** "make[s] it clear that, when a treating physician's testimony is based on a hypothesis, not the experience of treating the patient, it crosses the line from lay to expert testimony, and it must comply with the requirements of Rule 702 and the strictures of **Daubert** [**v. Merrell Dow Pharms.**, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)].").

Dr. Robinson: That would have been extremely difficult because you would have to take down all the other stitches in that area to get to that area which would lead the bleeding to start all over again.
Counsel: So the answer to that is you would not.

Dr. Robinson: Correct.

¶22.    The trial court asked Dr. Robinson's counsel why he had failed to disclose this testimony. Dr. Robinson's counsel responded that he did not need to disclose this testimony, since it was not an expert opinion or the standard of care. Dr. Robinson's counsel argued it was the process of what he went through, and it was what "*he would have done*." (Emphasis added.)

¶23.    The trial court responded, "You're saying that now in hindsight if I had known that I stitched it I would not have removed it anyway? . . . you don't think that was something that should have been disclosed in discovery . . . ?" Counsel responded that it was not an expert opinion, and that it was a factual issue/his thought process. "How would it be his thought process?" the trial court asked. "Because," Dr. Robinson's counsel answered, "it's what he would have done had he consulted a urologist and the urologist came in and said, I think this ureter is stitched. He's going to say that I wouldn't have touched it. I would not have removed this stitch given the friable uterus." The trial court concluded:

> Well at any rate at this point I fail to see how anything has changed based on this testimony. Dr. Robinson has yet to admit that he, in fact, did stitch the ureter. I don't expect him to change his testimony after he's already testified in front of the jury that it was only a possibility. So I fail to see how he could now come back and testify as to what decision he might have made or would have made when he was not faced with the situation. The argument from the defense is this was his mind-set. It was not his mind-set because that is not what occurred. It might be his mind-set now, but that is irrelevant because again we are talking about in hindsight has nothing to do with what occurred

11

at the time. What he did at the time, what he was thinking at the time may all be relevant. He was not thinking at this time by his own testimony and by the designations as well as the deposition information that the Court has reviewed thus far. To now have him come in and say well this is what was in my mind, this is what I would have done is simply incorrect. To now say I would have done this, but I'm still denying any of this happened, is purely speculative.

¶24. Like the physician in *McKenney*, Dr. Robinson was answering questions which require expert knowledge. The proposed testimony of Dr. Robinson–the opinion that he would not have attempted removal of the suture *if he had known* of its existence due to friable tissue and potential bleeding–is expert opinion testimony acquired *after* the surgical procedure had ended.

¶25. Before trial, Dr. Robinson denied suturing the ureter and stated that he was not aware of the stitch's presence when he closed the procedure. Dr. Robinson never changed his position, nor did he offer an expert opinion based on a hypothetical, until the trial began. So this opinion was not acquired *during* the care and treatment of Regina. *See Scafidel*, 486 So. 2d at 372. The trial court correctly observed that the proffered testimony was "hindsight" and could not have been part of Dr. Robinson's treatment or thought process during and immediately after the surgery. Because we review a trial court's exclusion of testimony for abuse of discretion, we find that the trial court did not abuse its discretion in denying Dr. Robinson's proposed testimony. *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003).

> **B.      Whether, even if Robinson's testimony amounted to expert opinion, his opinion was sufficiently designated during discovery.**

12

¶26.    Dr. Robinson also argues that, if this Court finds his testimony constitutes an expert opinion, then his expert designation provided Regina with sufficient notice. Mississippi Rule of Civil Procedure 26(b)(4)(A)(i) requires a party to identify each person whom they "expect[] to call as an expert witness at trial, [and] to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." Miss. R. Civ. P. 26(b)(4)(A)(i). This Court has stated that "the *substance of every* fact and *every* opinion which supports or defends the party's claim or defense must be disclosed and set forth in meaningful information which will enable the opposing side to meet it at trial." ***Bailey Lumber & Supply Co. v. Robinson***, 98 So. 3d 986, 997 (Miss. 2012) (quoting ***Nichols v. Tubb***, 609 So. 2d 377, 384 (Miss. 1992)). "[E]xpert testimony is subject to special discovery rules to 'allow the opposing party ample opportunity to challenge the witness' qualifications to render such opinion before the question soliciting opinion is posed in front of the jury." ***Griffin***, 877 So. 2d at 438 (quoting ***Sample v. State***, 643 So. 2d 524, 530 (Miss. 1994)).

¶27.    The Second Supplemental Designation of Experts identified Dr. Robinson as an expert in the field of obstetrics and gynecology. Dr. Robinson was designated to testify as follows:

> During the cesarean section, Dr. Robinson discovered an extension and/or laceration of the uterus down along the left cervix and uterine wall, down below the bladder. An extension and/or laceration of this nature is a known complication and risk associated with deliveries. It is anticipated that Dr. Robinson will further opine that he delineated the laceration, and it was sutured closed. There was *persistent bleeding from the laceration despite the sutures, as the tissue surrounding the laceration was quite friable*. The bladder was pushed out of the immediate site to isolate the area. *Dr. Robinson felt the ureter was out of the way, despite the difficulty posed by the edema and*

13

*bleeding. Hemostasis was achieved*, and the remainder of the surgery was completed as noted in the operative note, dates 07/26/1998.

*During the laceration repair, Dr. Robinson felt that the ureter and bladder were not compromised*. However, out of an abundance of caution, Dr. Robinson ordered a post-operative intravenous polygram (IVP) to be performed the following day. It is expected that Dr. Robinson will testify that this was a reasonable and prudent course of action and within the standard of care. It is further expected that Dr. Robinson will testify that he ordered a timely consult with Thad Carter, M.D., a urologist. Dr. Robinson will further testify that Dr. Carter performed a cystoscopy, which revealed an obstructed left ureter which is a known and accepted risk of pelvic surgery.

Dr. Robinson will testify consistent with his deposition taken on June 23, 2001. . . .

(Emphasis added.)

¶28.    Stated more concisely, Dr. Robinson was designated to testify that, during the uterus repair, "there was persistent bleeding from the laceration despite the sutures, as the tissue surrounding the laceration was quite friable." Dr. Robinson argues that, given the above, he was properly designated to testify about the standard of care.

¶29.    Regina argues that nowhere in this designation did Dr. Robinson "disclose in any meaningful fashion, or otherwise, the defense that there was dangerous or uncontrolled bleeding once the uterus was repaired." In fact, Regina argues, the designation states just the opposite: "Hemostasis was achieved, and the remainder of the surgery was completed . . . ." The designation also incorporates by reference the deposition testimony of Dr. Robinson, by which he testified that Regina's blood loss was "within a normal range of repeat C-section and laceration," and that he did not suture the ureter. Regina argues "the designation fails to disclose that Dr. Robinson was even aware that he had sutured the ureter during the

14

procedure or that, if he had known he placed a suture into the ureter, he would not have attempted removal due to fear of dangerous or uncontrolled bleeding."

¶30. We find that Dr. Robinson's expert designation was insufficient to put Regina on notice of the proffered testimony and new theory at trial. The very purpose of disclosing expert opinions before trial is "'to prevent trials from being tainted with surprise and unfair advantage[,]'" *Griffin*, 877 So. 2d at 441, and "to prevent trial by ambush." *See Nichols*, 609 So. 2d at 384 (stating that "[i]n no other area is a litigant more vulnerable to ambush than a plaintiff in a malpractice action against a member of some profession."). Based on Dr. Robinson's expert designation, we find that the opinion–he would not have removed the stitch from the ureter due to the threat of uncontrollable blood loss– was not meaningfully disclosed before opening statements at trial. Thus, the trial court did not abuse its discretion in excluding Dr. Robinson's proposed testimony due to his failure to disclose such testimony.

### C. Whether Regina's challenge is procedurally barred for failing to seek an order compelling discovery because of the insufficiency of Dr. Robinson's expert designation and interrogatory responses.

¶31. Dr. Robinson finally argues that if this Court finds his expert designation lacking, Regina's challenge still fails, as it is procedurally barred. In Mississippi, "if an answer to an interrogatory regarding an expert witness who will testify at trial is deemed insufficient by opposing counsel, some means of notice of such insufficiency must be given to the opposing party in order to let them know that additional information is desired." *Warren v. Sandoz Pharm. Corp.*, 783 So. 2d 735, 742 (Miss. Ct. App. 2000). Thus, "when a party receives an evasive or incomplete answer . . . the burden once against shifts to the party who has

propounded discovery, and they are required to seek relief from the court before sanctions can be imposed." *Id.* It is "imperative for [the party seeking expert disclosure] . . . to first seek relief from the trial court and have an order entered before seeking sanctions." *Id.* at 743.

¶32.    Counsel for Dr. Robinson argues Regina failed to take this action before seeking to exclude Dr. Robinson at trial, so this issue with Dr. Robinson's expert testimony is not preserved for appeal. We disagree. *Warren* is easily distinguishable from this case. In *Warren*, the designation at issue merely stated: "[defendant] reserves the right to call in its case-in-chief any treating physician, any expert witnesses listed by plaintiffs and any expert witness listed by any co-defendant, even if such co-defendant is not a party at the time of trial." *Warren*, 783 So. 2d at 742. Such designation clearly was evasive and incomplete. But Dr. Robinson's expert designation was not clearly evasive and incomplete on its face. Dr. Robinson's designation did, however, lack his theory that he would not have removed the suture in the ureter due to the possibility of uncontrollable bleeding.

¶33.    As Regina correctly notes, Dr. Robinson's argument that she should have filed notice of insufficiency assumes two things. First, it assumes his designation was deficient or incomplete on its face. Second, it assumes that Regina should have anticipated the opening statement that Dr. Robinson was going to offer testimony and opinions which were inconsistent with his previous deposition and his disclosure. We find that this issue is without merit and that Regina's appeal is not procedurally barred.

II.    **Whether Dr. Duboe's testimony that Dr. Robinson overestimated Regina's blood loss should have been excluded.**

16

¶34. The video trial deposition of Dr. Duboe, Regina's expert, was played for the jury. Immediately preceding the testimony at issue over hemoglobin and hematocrit levels, Dr. Duboe was extensively questioned by Dr. Robinson's counsel about Regina's blood loss during the C-section. When Dr. Robinson's counsel asked whether an attempt to investigate and repair the obstructed ureter could have resulted in a fatal loss of blood, Dr. Duboe countered by denying there was a large loss of blood and referred to a medical record which estimated Regina's blood loss at 500 ccs. Dr. Robinson's counsel then referred Dr. Duboe to Dr. Robinson's operative report which estimated blood loss at 900 ccs.

¶35. Dr. Robinson's counsel stated that Dr. Duboe characterized Regina's blood loss in a previous deposition as "excessive." Dr. Duboe denied characterizing Regina's blood loss as "excessive" in his previous deposition, and a challenge was made to find the previous deposition testiomony. The previous deposition testimony revealed that Dr. Duboe had characterized the blood loss as "extensive" and "within the average expectation of blood loss for a C-section."

¶36. Dr. Robinson's counsel then questioned Dr. Duboe about whether the uterine tissue was friable and whether such friable tissue could increase the risk of further bleeding if additional procedures such as an IVP or cystoscopy were performed intraoperatively to verify ureteral integrity. While answering this line of questioning, Dr. Duboe came back to the issue of estimated blood loss and refuted Dr. Robinson's counsel's earlier statements that Regina had suffered an excessive blood loss and that this abnormal blood loss was a factor in Dr.

17

Robinson's failure to conduct intraoperative testing to verify ureteral integrity. The following exchange occurred:

> Counsel for Dr. Robinson: Okay. Isn't that [postoperative swelling] a valid reason for ordering the IVP?
>
> Dr. Duboe: No, because an IVP that shows blockage due to swelling or edema – you're only doing a test to change your approach to the problem. If she had swelling or edema that's causing a blockage, if he truly suspected that, that means it's going to clear up. It's going to clear up within a matter of hours, and I wouldn't expect that he would consult a urologist. Once you have a patient a number of hours after a C-section that has had the repair that he has, he was concerned. I don't have any doubts that he was concerned about the integrity of the ureter. He says for ureteral integrity. He doesn't say to evaluate for edema. He doesn't say to evaluate for, for postop changes or swelling. He's interested in ureteral integrity, and that's the – you know, and that's a good test to order. I credit him for that. But what I'm saying is that he should have done the evaluation at the time the patient was open on the table and not waited until the next day to do it. That's my real sole criticism of Dr. Robinson in this particular case. *I will tell you also with respect to hemoglobin, her hemoglobin was 11.4 and then 11.8 on the next day. That's not particularly consistent with a blood loss of close to a thousand cc's, though you can have individual variance, but that really doesn't support that big of a blood loss. So there may be a question of overestimate of the blood loss as well.*

(Emphasis added.)

¶37.   Dr. Robinson's counsel objected to this testimony based on Regina's failure to disclose this expert opinion, and insofar as Dr. Duboe's answer was nonresponsive to the question. Regina conceded this opinion was not included in her expert designation. The trial court allowed the testimony, finding the question of blood loss to be relevant, and stating, "[w]hether it was in his designation or not, specifically it is clearly something that an OB/GYN deals with concerning hemoglobin counts, concerning repairs and surgeries of this

type." The trial court also found it was in response to previous questions asked by Dr. Robinson's attorney as to blood loss.

¶38.    Regina argues it is immaterial whether the expert designation of Dr. Duboe referenced hemoglobin or hematocrit since Dr. Robinson's counsel raised the issue by inviting the response to his own question. *See Hartel v. Pruett*, 998 So. 2d 979, 988 (Miss. 2008) (stating that, although a treatise was not disclosed in discovery in spite of a request, counsel "opened the door" by asking an open-ended question during cross-examination."). Although Dr. Robinson's counsel did not question Dr. Duboe about hemoglobin/hematocrit levels, and although Dr. Duboe was not designated to testify as such, we believe the answer was responsive to Dr. Robinson's counsel's questions as to excessive blood loss and the concerns with performing an intraoperative IVP in light of such blood loss. This Court applies an abuse-of-discretion standard when a trial court decides "whether a party opens the door for an opposing party to inquire about otherwise inadmissible evidence." *Id.* (quoting *APAC-Mississippi, Inc. v. Goodman*, 803 So. 2d 1177, 1185 (Miss. 2002)). We find that the trial court did not abuse its discretion in allowing Dr. Duboe's testimony about hemoglobin and hematocrit levels, since he was answering questions asked by Dr. Robinson's counsel as to Regina's blood loss.

### III.    Whether remittitur of the award was required.

¶39.    At the conclusion of the trial, the jury returned an unanimous verdict with the following damages awarded to Regina: $55,634.78 for past medical expenses; $8,507.20 for lost wages; and $420,000 for past physical and emotional pain and suffering. The total jury

19

verdict was $484,141.98. Dr. Robinson argues that the stark contrast between the amount of actual damages and the jury verdict provides an inference of bias, prejudice, or passion by the jury, so a remittitur is required.

¶40.    Under Section 11-1-55 of the Mississippi Code, this Court may order a remittitur "if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence." Miss. Code Ann. § 11-1-55 (Rev. 2014). Whether a jury award is excessive is determined on a case-by-case basis. *Purdon v. Locke*, 807 So. 2d 373, 376 (Miss. 2001). This Court has applied the following standard to determine whether a jury verdict is excessive:

> Where a trial court refuses to grant a remittitur, this Court reviews the decision for abuse of discretion. The jury's award is not to be set aside unless it is entirely disproportionate to the injury sustained. However, when determining the reasonableness of an award, the sky is simply not the limit. The Court looks to see whether the verdict is so excessive it shocks the conscience evidencing a bias, passion and prejudice on the part of the jury.

*Estate of Jones v. Phillips ex rel. Phillips*, 992 So. 2d 1131, 1150 (Miss. 2008) (quoting *Gatewood v. Sampson*, 812 So. 2d 212, 222-23 (Miss. 2002) (citations and quotations removed)).

¶41.    It is mainly the jury's role "to determine the amount of damages to be awarded and the award will normally not be 'set aside unless so unreasonable in amount as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous.'" *Phillips*, 992 So. 2d at 1150 (quoting *Foster*, 715 So. 2d at 183).

20

¶42.    Dr. Robinson argues that the award here shocks the conscience and is subject to remittitur. He relies on *Entergy Mississippi, Inc., v. Bolden*, 854 So. 2d 1051, 1053 (Miss. 2003), in which this Court ordered a remittitur in a personal-injury case. The plaintiff was injured in a car accident and claimed special damages of $41,286. *Id.* at 1058. The jury awarded $490,000 for pain and suffering, with a total verdict of $532,000. *Id.* The trial court denied the motion for remittitur, but this Court remitted the award by $300,000, for a total of $232,000. *Id.* This Court in *Bolden* concluded "that the scant testimony offered in support of damages for pain and suffering . . . [did] not justify such a large award of damages for pain and suffering." *Id.*

¶43.    But *Bolden* is distinguishable from this case. Regina testified as to her injuries, medical care, and pain and suffering as a result of the procedure. Regina's nephrostomy tube was removed around seven months after the C-section, and a series of stents were placed to resume urinary flow to the bladder. Regina testified that the urine collection bag she wore often leaked–sometimes in public–and that it wet her clothing, causing frequent skin rashes and much embarrassment. Regina was required to undergo many medical procedures over the eleven months following the C-section, including the painful placement of a series of ureteral stents.  Regina testified she was unable to hold and care for her newborn son for an extended time after his birth due to the pain associated with the ureteral stent and nephrostomy.

¶44.    Brian Corr, Regina's husband, described Regina's difficulties and how she was unable to care for their newborn son due to the ureteral stent and nephrostomy. He also testified how

21

he repeatedly cleaned the nephrostomy site and that Regina was forced to sleep in a chair in an upright position for a period of time following the C-section to lessen the pain of the ureteral stent and nephrostomy tube.

¶45.    Considering this testimony, we find that Dr. Robinson has not presented any evidence that the jury verdict was influenced by bias, prejudice, or passion, or that it was contrary to the overwhelming weight of credible evidence. This Court has held that, though the sky is not the limit as to jury verdicts, the jury "necessarily has especially broad leeway" because "pain and suffering is, to a large degree, not susceptible to monetary qualification." ***Illinois Cent. R. Co. v. Gandy***, 750 So. 2d 527, 534 (Miss. 1999). This Court has upheld jury verdicts that were substantially more than the special damages. *See, e.g.*, ***Phillips***, 992 So. 2d at 1150-51(eleven times the special damages), and ***Purdon v. Locke***, 807 So. 2d 373 (Miss. 2001) (fourteen times the special damages). The award to Regina of $420,000 for pain and suffering amounts to six-and-a-half times the total special damages. We find that Regina offered credible and substantiated testimony as to her pain and suffering, and that the jury award was not unreasonable or outrageous in light of her testimony. Thus, this issue is without merit.

## **CONCLUSION**

¶46.    Dr. Robinson failed to disclose sufficiently in his expert designation the theory that, had he know of the stitch in the ureter, he would not have removed the stitch given the friable tissue and possibility of uncontrollable bleeding. While Regina's expert was not designated to testify about hemoglobin and hematocrit levels, the expert's answer was in response to

questioning from Dr. Robinson's counsel about Regina's blood levels. Finally, Dr. Robinson has not shown any inference of bias, passion, or prejudice on the part of the jury to require this Court to order a remittitur. Thus, we affirm the judgment of the Harrison County Circuit Court in Regina Corr's favor.

¶47. **AFFIRMED**.

**DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, KING, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR.**