# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00535-COA

**MIMG C WOODRIDGE SUB LLC, MONARCH INVESTMENT & MANAGEMENT GROUP LLC D/B/A WOODRIDGE APARTMENTS, LAKASHA THOMAS, INDIVIDUALLY, AND SHUANACY EVANS, INDIVIDUALLY**

**APPELLANTS**

v.

**KIMBERLY COURSE**

**APPELLEE**

DATE OF JUDGMENT: 02/04/2021
TRIAL JUDGE: HON. WINSTON L. KIDD
COURT FROM WHICH APPEALED: HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANTS: RICHARD EDWARD KING
MATTHEW TAYLOR BIGGERS
OLIVIA YEN TRUONG
ATTORNEY FOR APPELLEE: JAMES ASHLEY OGDEN
NATURE OF THE CASE: CIVIL - OTHER
DISPOSITION: AFFIRMED - 02/14/2023
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., GREENLEE AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1. A woman and her children arrived at their apartment to find an office key left inside the door and their home burglarized. The burglar stole several items. Afterward, the woman's anxiety became so debilitating that she began seeing a psychiatrist. She then sued the apartment complex for allowing the burglar access to the office keys.

¶2. A jury awarded the woman $450,000 for past and future pain and suffering. Finding the jury award was not excessive in light of the evidence, we affirm.

**FACTS**

¶3.     After deciding to convert her house in south Jackson into a daycare, Kimberly Course began her search for a new home. Her core concern was the safety of her and her two daughters, who were ages five and two. During her search, she found Woodridge Apartments.[1] Woodridge caught the mom's attention because it was the only apartment complex that displayed signs stating "premises under video surveillance." She also talked to the manager of the apartment complex who ensured her "it was a safe place" because a "courtesy officer" lived "right next door."

¶4.     Kimberly further considered her family's safety when choosing which floor to live on. She stated she "opted out" of staying on the first floor of the apartment complex in the event something happened. Safety was such an important feature to Kimberly because she had experienced a burglary in 2012 before her two daughters were born.

¶5.     Unfortunately, Kimberly's efforts did not completely shield her family from danger. One morning, Kimberly carried out her normal daily routine. She stated, "I got up and got my kids ready to go" to school and to daycare. Then, Kimberly locked her apartment door.

¶6.     Later that evening, she picked up her two little girls and went home. The family got out of the car and went upstairs. But the scene was different this day. She noticed there was an office key left in her door. Confused, Kimberly looked at her key ring but saw that her door key was "in [her] hand." She also knew that she had not given maintenance permission

---

[1] The appellants in this case are MIMG C Woodridge Sub LLC, Monarch Investment & Management Group LLC d/b/a Woodridge Apartments, Lakasha Thomas, and Shuanacy Evans. We will refer to them collectively as "Woodridge."

to enter her apartment.

¶7.     The now-concerned mother "told [her] girls to wait . . . and let [her] make sure everything is okay." She walked into the apartment and screamed to see if anyone was there. But what she noticed was "disturbing." Her "drawers were opened" in her room. And she found no letter stating maintenance performed any repairs. She tried to stay calm and not "be too bothered" so her two little girls would not "feel like something [was] wrong."

¶8.     Kimberly then called the police. Kimberly told the officer everything that happened. The burglar had taken a PlayStation, her .38-caliber handgun, and a MacBook Pro laptop. The officer made a report and told Kimberly she needed to "speak with someone in the office because [that] was an office key" left in her door.

¶9.     Kimberly told the assistant manager the details of the incident. Specifically, she told her about the office key left in her door. The assistant manager said she was not at the apartment complex at the time of the incident, and she would call Kimberly back.

¶10.    But Kimberly never received a call. She became so stressed while at work that she decided to take off early and go into the office to talk to management.

¶11.    She again told the assistant manager about the incident and that someone "mishandled the [office] keys." But the assistant manager was "rude" and told Kimberly she "should have had insurance" to cover what was stolen.

¶12.    Kimberly left the office. She later called the corporate office, leaving voicemails on multiple occasions. But "they never returned [her] phone call."

¶13.    But Kimberly was undeterred. The next day, she talked to the actual manager of

3

Woodridge. The manager appeared as if she "didn't know what was going on." She asked Kimberly to leave the key found in her door. Kimberly took a picture of the key and left it in the office with the manager.

¶14. After not receiving a call back from the corporate office or the managers, Kimberly continued trying to figure out who broke into her apartment. She contacted the manager and requested she "just roll the cameras back and see who actually went in the apartment." But the manager told Kimberly the cameras did not "cover her apartment." Instead, the cameras only covered the area outside of the office and a building "right across" the street.

¶15. Kimberly continued expressing her fear and discomfort after the break-in. She wrote two letters to the manager stating she no longer wanted to live in the apartment because they "[didn't] know what's going on with the keys." Kimberly told the manager she would not pay rent until they got to the bottom of the issue. In response, the office gave her a three-day notice to move out.

¶16. As Kimberly fought to get the issue resolved, she faced serious physical and psychological issues. She testified that for three and a half weeks, she "slept on the couch with a knife with a chair propped up to the door." The scared mother was "miserable" from staying up "all night making sure her girls [were] straight" and making sure that no one came into the apartment. When Kimberly felt any sort of discomfort she said, "I would call my mom or my sister down the street and tell them what was going on and how I feel."

¶17. But those were not the only symptoms Kimberly experienced. The mother also suffered headaches and stomachaches. Her anxiety became so crippling that she "urinate[d]

4

on [herself] about three or four times."   She would later testify:

> A.   Before I unlock the door for us to get out I make sure my purse is on my shoulders. My baby is four, but she is pretty small so I grab her on one arm and I get my big girl and run in.
>
> . . . .
>
> A.   Because I always think somebody is following me and watching me . . . so I try to get in as quickly as possible.

¶18.   This began to affect her work life.  The fearful mother could not "concentrate at work," having to "put her head down."

¶19.   Kimberly told her family doctor about her mental health issues from the break-in.  He then referred her to Dr. Gordon, a psychiatrist.  Dr. Gordon performed a psychological evaluation of Kimberly and recommended a treatment plan consisting of "psychotherapy once a week . . . for about three years."

¶20.   Kimberly filed a lawsuit against the apartment complex and proceeded to trial.

## PROCEDURAL HISTORY

¶21.   At trial, Kimberly testified regarding the costs of her medical treatment.  She said that her past medical expenses totaled $11,480.  But Kimberly expressed this would not be the last of her medical expenses because she planned to see a doctor in the future.

¶22.   Kimberly expected to receive future treatment because her symptoms persisted.  She testified extensively regarding her physical and psychological issues.  Kimberly stated at trial that she still has headaches, and to alleviate those headaches she said she would "take BCs probably every other day or sometimes every day."

¶23.   She also testified she had just seen her counselor a week before her trial began.  And

5

when asked if she expected her emotional or psychological issues to continue, Kimberly responded, "They are continuing now[.]" Unfortunately, the mother became so scared, she began worrying that someone would harm her and her children.

¶24. Kimberly's mother also testified. She explained to the jury how her daughter was before the break-in. She testified, "My daughter was a strong girl. She took care of her own two kids on her own." When asked how Kimberly was mentally before the break-in, Kimberly's mother responded, "She was fine back then."

¶25. But Kimberly's mother described her as "totally different" after the break-in. She stated her daughter was "fearful" and that she has "anxiety all the time." So much so, that her mother stated she has to "be there when [Kimberly] go[es] to work" and that her sister "trails her home" after work. But even this was not enough to quell her daughter's anxiety. Kimberly's mom further testified that when Kimberly is finally ready to go home at the end of the night, she "sit[s] on the side of the street with [her] flashers on until she [is] ready to get into her house."

¶26. Kimberly's psychiatrist, Dr. Gordon, also testified. He stated Kimberly said she was not coping as a result of the break-in:

> [W]hat she had is what was called generalized anxiety which involves excessive worrying, excessively having some manic symptoms, stomachache, headaches, not feeling well, having difficulty with being ill at ease, being hypervigilant.

¶27. Dr. Gordon found that Kimberly's anxiety was in part due to her laptop being stolen. He stated Kimberly told him that "she had the feeling that whomever burglarized her . . . apartment had personal information about her" from the laptop, so "they would be able to

6

watch her[.]" Even more of a source of Kimberly's anxiety was her concern for her children. She was "not sure if [she would be] able to really take care of them" because of what happened. According to Dr. Gordon, this caused the mother to "worry all the time."

¶28.  Because of Kimberly's unfortunate psychological issues, he developed a treatment plan. The goal of those therapy sessions was to "retrain her brain in terms of teaching her ways not to have nervousness or anxiety."

¶29.  He testified the total cost for the future plan was between $23,800 and $26,400. He stated the cost of his treatment plan was "reasonable based on [his] practice and based on what [he has] seen in these particular situations." The doctor also testified that the treatment was necessary.

¶30.  Woodridge's psychiatrist also testified. The doctor stated he met with Kimberly for a "one-time evaluation." His medical opinion was that "she doesn't need any" future treatment as a result of the break-in. However, the doctor stated on cross-examination that meeting with Dr. Gordon and a counselor was "very positive" for Kimberly.

¶31.  The jury awarded Kimberly a total of $492,080 in damages. Those damages were broken down as $3,500 for stolen or damaged property, $11,480 for past medical bills, and $26,400 for future medical costs, for a total of $42,080 in economic damages. The jury also awarded Kimberly $250,000 for past pain, suffering, and mental anguish and $200,000 for future pain, suffering, and mental anguish, for a total of $450,000 in noneconomic damages.[2]

¶32.  Woodridge then filed a motion for remittitur, arguing the awards of noneconomic

_____

[2] The jury voted unanimously to find liability; the vote was 11-1 on damages for past pain and suffering, and 9-3 on the damages for future pain and suffering.

7

damages awarded to Kimberly were excessive because the jury was influenced by bias, prejudice, or passion or were otherwise contrary to the overwhelming weight of credible evidence. The trial court denied Woodridge's motion, and the apartment complex timely appealed.

## DISCUSSION

**Whether the jury's award of noneconomic damages was excessive.**

¶33. On appeal, the apartment complex only raises one issue. Specifically, Woodridge argues the jury's award of noneconomic damages was excessive.

¶34. Woodridge does not contest liability. It also does not contest the economic damage award of $42,080.

¶35. "The standard of review for the denial of a remittitur is abuse of discretion." *Entergy Miss. Inc. v. Bolden*, 854 So. 2d 1051, 1058 (¶20) (Miss. 2003). "There are no fixed standards as to when an additur or remittitur is proper." *Id*. "We will not disturb a jury's award of damages unless its size, in comparison to the actual amount of damage, shocks the conscience." *Id*. "A remittitur is appropriate when either (1) the jury or trier of fact was influenced by bias, prejudice, or passion, or (2) the damages were contrary to the overwhelming weight of the evidence." *Id*. "The bias, prejudice or passion standard is purely a circumstantial standard." *Id*. "Evidence of corruption, passion, prejudice or bias on the part of the jury (if any) is an inference to be drawn from contrasting the amount of the verdict with the amount of the damages." *Id*.

¶36. Furthermore, "we proceed on a case-by-case basis in determining whether a jury

8

award is excessive." *Id*. "Even if we think the amount awarded in the verdict is liberal, we are not allowed to supplant our judgment for that of the jury unless we conclude that there was insufficient evidence to support the award of damages . . . ." *Cade v. Walker*, 771 So. 2d 403, 406 (¶7) (Miss. Ct. App. 2000). "[W]e are required to view the evidence in a light most favorable to the jury's verdict, giving her the benefit of all favorable inferences that may reasonably be drawn." *Id*. at 407 (¶8).

¶37. Also, "while pain and suffering is, to a large degree, not susceptible to monetary quantification, the jury necessarily has especially broad leeway." *Id*. at 408 (¶11).

¶38. Woodridge's sole argument is that the jury's finding of noneconomic damages was too excessive compared to the jury's finding of Kimberly's underlying loss. The apartment complex protests the amount "is almost 12 times the amount of medical expenses."[3] Over the years, our appellate courts have examined this issue many times and approved verdicts in a great range.

¶39. For instance, this Court has affirmed an award of 51 times the amount of medical damages. *Cade*, 771 So. 2d at 410 (¶21). A man driving a Wal-Mart truck crashed into the side of a woman's car. *Id*. at 405 (¶2). At first, the woman stated she felt no pain, but nearly two weeks after the accident, she began feeling a nagging pain in her neck and lower back. *Id*. at 406 (¶4). She was able to work consistently as she had before the accident, but decided to visit a doctor. *Id*. The doctor told her to take Tylenol for her neck and back pain, and to come back if the pain persisted. *Id*. The woman's pain continued. *Id*. This time, her X-ray

---

[3] The noneconomic damages are 10.6 times the total economic damages.

was taken but her results were "normal." *Id*. However, the doctor diagnosed her with a lumbar injury and prescribed her anti-inflammatory medication. *Id*. She was released from the doctor's care shortly thereafter because she responded well to treatment. *Id*.

¶40.    She also stated she suffered emotional and mental distress because of the accident. *Id*. at (¶5). She said she felt nervous every time she passed an eighteen-wheeler. *Id*. She incurred $569 in medical bills. *Id*. She "asked for and was awarded $29,099 in total damages." *Id*.

¶41.    The defendant appealed to this Court. *Id*. In determining whether the jury's award of 51 times the amount of medical damages was excessive, the Court conducted a comparison of awards, specifically focusing on cases where mental anguish was a component. *Id*. at 408 (¶12). The Court acknowledged the difficulty in conducting the comparison because "no two cases are exactly alike." *Id*.

¶42.    The Court reviewed several cases and found the greatest jury award affirmed was 18.5 times the plaintiff's medical expenses and the lowest jury award affirmed was 5.4 times the plaintiff's medical expenses. *Id*. at 410 (¶19). In both cases, the plaintiff suffered physical and mental anguish, including the inability to function and several hospitalizations. *Id*. at 408-09 (¶13-15).

¶43.    After reviewing those cases, the Court made its comparison. *Id*. at 409-10 (¶19). The Court acknowledged the woman's injuries were "minimal in comparison to the discussed cases" and that her jury award was "three times higher" than the greatest award that the Court reviewed. *Id*. at 410 (¶20). But even those considerations did not compel this Court to

reverse the award. *Id*. Instead, we stated, "the amount of damages is primarily a concern for the jury." *Id*. While "the sky is not the limit with regard to jury verdicts," the Court in *Cade* nonetheless found the jury had "especially broad leeway." *Id*. Ultimately, the Court "defer[red] to the jury" and affirmed the plaintiff's award. *Id*.

¶44. The Supreme Court has also upheld an award of approximately 38 times the plaintiff's medical expenses. *Gatewood v. Sampson*, 812 So. 2d 212, 224 (¶30) (Miss. 2002). In that case, a man was shot in the head at a gas station. *Id*. at 216 (¶2). He sued the owner of the gas station alleging the owner was negligent by not providing reasonable security. *Id*. at (¶3). The jury awarded him $308,000 in compensatory damages—38 times the proof of special damages. *Id*. The owner appealed, arguing the verdict was excessive. *Id*. at (¶4). In determining whether the verdict was excessive, the Court considered the plaintiff's injuries, which included dizziness, nightmares, headaches, and depression. *Id*. at 223 (¶26). Ultimately, the Court found the jury award was not entirely disproportionate to the injuries that the defendant sustained. *Id*. at (¶28).

¶45. In the years after that case, we also affirmed a jury award of approximately 27.7 times the amount of the plaintiff's medical expenses. *APAC Miss. Inc v. Johnson*, 15 So. 3d 465, 479 (¶39) (Miss. Ct. App. 2009). A woman was driving on Highway 82 when a large truck struck a power line and traffic signal. *Id*. at 469 (¶2). As a result, the pole fell onto the woman's car, causing her to spin out of control. *Id*. She was removed from the vehicle with the "jaws of life" and taken to the hospital via ambulance. *Id*. at (¶3). While no surgery was required, the woman suffered fractures to her spine and was ordered to wear a neck brace for

11

about five weeks. *Id*. The woman sued the truck company and driver alleging negligence. *Id*. at (¶4). A jury awarded her $350,000 in damages—27.7 times her actual medical costs. The company appealed. *Id*.

¶46. In determining whether the jury's award was excessive, this Court considered the woman's injuries. *Id*. at 479 (¶37). She had to be pulled from her car with the jaws of life, suffered from spine fractures, and wore a neck brace for at least five weeks. *Id*. The Court also considered the woman's testimony regarding ongoing pain and trouble sleeping. *Id*. The Court stated, "[D]ue to the uncertainty of the monetary value placed on pain and suffering and future damages, this Court has affirmed damages up to fifty-one times the actual damages shown." *Id*. And echoing the Court's ruling in *Cade*, the Court afforded the jury "broad leeway" and held that the evidence did not warrant setting aside the jury's verdict. *Id*. at (¶39).

¶47. In a more recent case, our Supreme Court affirmed a jury award of 6.5 times the plaintiff's medical expenses. *Robinson v. Corr*, 188 So. 3d 560, 573 (¶45) (Miss. 2016). There, a doctor delivered a woman's baby via Caesarean section. *Id*. at 563 (¶2). However, the woman's uterus was lacerated and needed surgical repair. *Id*. The woman testified regarding the pain and irritation associated with the several surgeries to repair her uterus. *Id*. at 573 (¶43). She also testified she had to wear a urine collection bag that sometimes leaked in public. *Id*. A jury awarded her $420,000 for pain and suffering—six-and-a-half times the woman's medical expenses. *Id*. at 573 (¶45). The doctor filed a motion for remittitur, and the trial court denied his motion. *Id*. at 565 (¶12). He then appealed. *Id*.

¶48.    On appeal, the Supreme Court found the jury's award of noneconomic damages was not unreasonable or outrageous in light of the credible and substantiated testimony regarding her injuries. *Id*. at 573 (¶45).

¶49.    In the instant case, we want to emphasize the Supreme Court's ruling that "the jury necessarily has especially broad leeway" in determining pain and suffering and other noneconomic losses. *Cade*, 771 So. 2d at 408 (¶11).

¶50.    And parallel to the plaintiffs in *Gatewood* and *Johnson*, Kimberly provided ample evidence to support the jury's award of nearly twelve times her past and future medical expenses.

¶51.    First, Kimberly testified. She stated she suffered both physically and mentally as a result of the break-in. The mother stated she experienced headaches and stomachaches due to her anxiety. She was so afraid for her family's safety that for three and one-half weeks she slept on her couch with a knife. The extent of her anxiety was further revealed when she testified she "urinated on herself three or four times." She stated several times she was "scared" and thought someone was watching or following her. She also told the jury she suffered at work because she could not "concentrate at work." Kimberly explained that her issues existed at the time of the trial.

¶52.    Next, the jury heard Kimberly's mother testify. Her mother described her as "strong" before the break-in; however, she described Kimberly as "totally different" afterwards. The jury heard Kimberly's mother testify that Kimberly's anxiety was so extreme that she and Kimberly's sister often accompanied her home.

13

¶53.    Furthermore, the jury heard from Kimberly's psychiatrist, Dr. Gordon. He testified that he evaluated Kimberly and ultimately diagnosed her with generalized anxiety. He stated she not only "excessively worried" about her family's safety, but she also displayed manic symptoms. After explaining how he came to his diagnosis, he further told the jury the recommended treatment plan for Kimberly, which included future treatment and its estimated cost. Even Woodridge's psychiatrist conceded that meeting with Dr. Gordon and a counselor was very positive for Kimberly.

¶54.    The jury heard the evidence and determined her award for past and future pain and suffering. This award was not excessive in light of the "broad leeway" that the jury possessed and the ample evidence of Kimberly's psychological issues. Nor does the noneconomic damages award exceed the statutory restriction of $1,000,000 placed by the Legislature. *See* Miss. Code Ann. § 11-1-60 (2012) (stating the plaintiff shall not be awarded more than $1,000,000 for noneconomic damages).

¶55.    Critically, Woodbridge chose not to contest on appeal the jury's findings on liability, which leaves the underlying facts locked in place.

¶56.    However, the apartment complex argues in the alternative that the verdict here was not consistent with prior awards for similar injuries. But we have expressly recognized that "no two cases are exactly alike." *Cade*, 771 So. 2d at 408 (¶12). And even where the verdict was three times more than the greatest jury award reviewed, this Court nonetheless yielded to our deferential standard and affirmed the jury's award. Kimberly's injuries may have been "minimal in comparison" to several other cases, but this does not thwart our standard on

appeal. *Cade*, 771 So. 2d at 409 (¶20).

¶57.   The separate opinion contends the jury's determination was excessive because the underlying crime was "a commonplace event." This case embodies the maxim in *Cade* that no two are alike. As established at trial, and not contested on appeal, several facts make this a unique situation. The crime here was not a random act of violence perpetrated against Kimberly in her family home, one which might have been unforeseen and unstoppable. First, the apartment complex emphasized to Kimberly that it provided a safe place to live; not only were there signs stating the premises were under surveillance, but she was told a "courtesy officer" lived next door to her apartment; Kimberly later found out the cameras did not cover her apartment. Second, it was not brute force that allowed a burglar into the apartment, but an actual key, leading to the conclusion that the apartment complex either lost the key or failed to secure it. Last, even after management was made aware of the crime and the loss of property, the apartment complex showed utter indifference to its tenant. The crime underlying this lawsuit then was not a "garden variety apartment burglary."

¶58.   The Supreme Court has ruled that "[a]wards set by jury are not merely advisory and generally will not be set aside unless so unreasonable as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous." *Miss. State Fed'n of Colored Women's Club Hous. for Elderly in Clinton Inc. v. L.R.*, 62 So. 3d 351, 368 (¶58) (Miss. 2010). Given the proof in this case, we cannot say the verdict was "unreasonable." *Id*. Therefore, the trial court did not abuse its discretion in denying Woodridge's motion for remittitur.

**CONCLUSION**

¶59. Regarding a jury's finding of damages, the Supreme Court has ruled that "[e]ach case must be decided on its own particular facts." *Stratton v. Webb*, 513 So. 2d 587, 591 (Miss. 1987). Because Kimberly proved her noneconomic damages by a preponderance of the evidence, the jury's award of $450,000 was not excessive. Therefore, we find the trial court did not abuse its discretion in denying Woodridge's motion for remittitur.

¶60. **AFFIRMED.**

**CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J.**

**WILSON, P.J., DISSENTING:**

¶61. The jury awarded the plaintiff $450,000 for mental anguish based on an apartment burglary that occurred when no one was home. Those damages must be reduced because they "are excessive" and "contrary to the overwhelming weight of credible evidence." Miss. Code Ann. § 11-1-55 (Rev. 2019). Because the majority instead affirms the award in its entirety, I respectfully dissent.

¶62. A remittitur should be granted "if the court finds that the damages are excessive . . . for the reason that the jury . . . was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence." *Id.* The statute articulates two grounds for a remittitur, but "they essentially are one and the same." *Cade v. Walker*, 771 So. 2d 403, 407 (¶11) (Miss. Ct. App. 2000). "The overwhelming weight of credible evidence standard is objective and applied by reference to the law on

16

recoverable damages when applied to the evidence in the case. . . . The bias, prejudice or passion standard is purely a circumstantial standard since we obviously have no way of knowing what was in the jury's mind." *Id.* "[T]he question then becomes whether the verdict was . . . so excessive . . . as to shock the conscience and to indicate bias, passion and prejudice on the part of the jury, or, whether the jury failed to respond to reason." *Id.*

¶63.   "Compensatory damages are such damages as will compensate the injured party for the injury sustained, and nothing more; such as will simply make good or replace the loss caused by the wrong or injury." *Parsons v. Walters*, 297 So. 3d 250, 259 (¶32) (Miss. 2020) (quotation marks omitted). "Compensatory damages should not be awarded as a means of punishment or deterrent for a defendant's reprehensible behavior, for [that] is the role of punitive damages . . . ." *Id.* Because "pain and suffering is, to a large degree, not susceptible to monetary quantification, the jury necessarily has especially broad leeway." *Cade*, 771 So. 2d at 408 (¶11). But "the discretion vested in the jury is not an arbitrary discretion. It must be exercised reasonably and intelligently to the end that the plaintiff may recover reasonable compensation for the loss he has sustained." *Kinnard v. Martin*, 223 So. 2d 300, 303 (Miss. 1969). Stated simply, "the sky is not the limit." *Cade*, 771 So. 2d at 408 (¶11).

¶64.   In this case, Kimberly Course's apartment was burglarized while no one was home, and a laptop, revolver, and video game console were taken. The jury awarded Course damages for stolen property ($3,500), an unreturned security deposit ($700), past medical bills ($11,480), and anticipated future medical costs ($26,400).[4] The jury also awarded

---

[4] Course's past medical bills and anticipated future medical costs all relate to psychiatric treatment.

17

Course $250,000 for past pain, suffering, and mental anguish and another $200,000 for future pain, suffering, and mental anguish.[5] While Course is entitled to compensation for her distress, $450,000 for pain, suffering, and mental anguish is excessive and contrary to the overwhelming weight of the evidence. Miss. Code Ann. § 11-1-55.

¶65.   In *Entergy Mississippi Inc. v. Bolden*, 854 So. 2d 1051 (Miss. 2003), the plaintiff (Bolden) suffered injuries to her left knee, shoulder, and ankle in a car wreck. *Id.* at 1053-54 (¶¶2-3). She required surgery on her knee and a subsequent surgery on her ankle, incurring medical expenses of $31,686.06. *Id.* at 1054 (¶4). She was unable to return to her job as a security officer, resulting in lost wages of $9,600. *Id.* Her injuries caused permanent impairments to her knee and ankle and increased her risk of developing arthritis. *Id.* The jury awarded Bolden $532,000 for her medical expenses, lost wages, and past and future physical and emotional pain and suffering. *Id.* at 1053, 1058 (¶¶1, 21). The trial judge denied the defendant's request for a remittitur. *Id.* at 1053 (¶1). But the Supreme Court held that the trial judge abused his discretion because "the scant testimony offered in support of damages for pain and suffering [did] not justify such a large award." *Id.* at 1058 (¶21). The majority opinion in *Bolden* did not describe Bolden's evidence of pain and suffering, but the partial dissent provided the following summary:

> As a result of the wreck Bolden reinjured her knee which caused painful swelling and later required surgery and physical therapy. She injured her ankle which required surgery, physical therapy, and the use of a brace. Bolden also injured her shoulder which required her to wear a sling. As a result of these

___

[5] In his closing argument, Course's attorney had urged the jury to award $400,000 for past pain, suffering, and mental anguish and another $400,000 for future pain, suffering, and mental anguish.

18

injuries, Bolden is still required to participate in physical therapy and perform home exercises. Physician testimony indicated that Bolden will likely develop arthritis in both her knee and ankle and will continue to walk with a limp. Physician testimony also established that she will likely be required to have another ankle surgery in the future. Bolden has two scars from the accident, one on her knee and one on her ankle. She will also have trouble walking on uneven ground, up and down stairs, and standing for a prolonged period of time. Bolden, as a thirty-two year old single mother, had trouble caring for her three children as a result of her injuries. She lost her home because she was unable to work and pay her bills and sank into depression.

*Id.* at 1065 (¶37) (McRae, P.J., concurring in part and dissenting in part). Despite Bolden's serious injuries, the Supreme Court granted a remittitur, reducing the verdict from $532,000 to $232,000, which, after taking into account Bolden's medical expenses and lost wages, effectively reduced her pain-and-suffering award to $191,713.94. *Bolden*, 854 So. 2d at 1058 (¶21). *Bolden* was decided almost twenty years ago, so the remitted award in that case should be adjusted for inflation for comparison here. Even so, the inflation-adjusted present value of Bolden's remitted pain-and-suffering award is around $300,000.[6]

¶66. Course's injuries are less severe than Bolden's injuries. Course suffered no actual physical trauma or physical injury. She testified that she has frequent headaches and stomachaches, which she and Dr. Gordon attributed to the burglary.[7] But these issues did not prevent her from continuing to manage the daycare she owned and operated. In contrast, Bolden not only experienced mental anguish but also suffered serious physical injuries that

---

[6] *See* United States Bureau of Labor Statistics, CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm (last visited Feb. 9, 2023).

[7] Dr. Gordon diagnosed Course with "generalized anxiety disorder," noting that "[s]he didn't meet the criteria for . . . posttraumatic stress disorder because she didn't have a trauma that would have involved something that would have threatened her life."

19

required multiple surgeries and a lengthy course of physical therapy, caused permanent physical impairments, and prevented her from returning to her job. Despite these serious injuries, the Supreme Court remitted Bolden's noneconomic damages to less than $200,000, which is about $300,000 when adjusted for inflation. If, as a matter of law, Bolden could recover no more than that amount, it logically follows that Course's recovery for her comparatively less serious injuries must be lower.

¶67. A burglary is a distressing event, and I do not want to trivialize Course's distress. But the fact remains that this case involved a garden-variety apartment burglary that occurred while no one was home. Course suffered no physical injuries and never even saw the thief. Unfortunately, burglaries are not uncommon. The FBI reported that in 2019, more than one million burglaries were committed in the United States—about one every 28.3 seconds.[8] The mere knowledge that such a commonplace event occurred in one's apartment cannot rationally support a pain-and-suffering award of $450,000.

¶68. Indeed, Course herself had been the victim of a previous burglary. In 2012, her prior residence was burglarized. The 2012 burglary also occurred while Course was away from home, and she did not see the burglar or experience any physical injury. Course testified that after the 2012 burglary, she simply "followed protocol"—i.e., she made a police report and filed an insurance claim. Course acknowledged that except for ordinary stress, she did not experience any psychological issues as a result of the 2012 burglary. Course testified that

---

[8] Federal Bureau of Investigation, Crime in the United States (2019), https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/burglary and https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/crime-clock.

the burglary at issue in this appeal was different because she had two children and because Woodbridge was negligent. However, these differences cannot rationally account for $450,000 in damages for pain and suffering.

¶69. The jury in this case "failed to respond to reason" when it awarded Course $450,000 for pain and suffering. *Cade*, 771 So. 2d at 407 (¶11). The damages awarded "are excessive" and "contrary to the overwhelming weight of credible evidence." Miss. Code Ann. § 11-1-55. Because mere knowledge that a burglary occurred in one's apartment cannot support $450,000 in pain-and-suffering damages, I would order a remittitur as to past and future pain and suffering. The evidence in this case certainly cannot justify more than half of the inflation-adjusted pain-and-suffering damages that the Supreme Court upheld in *Bolden*. Therefore, I would order a remittitur to $100,000 for past pain, suffering, and mental anguish and $50,000 for future pain, suffering, and mental anguish. Since the majority instead affirms the award in its entirety, I respectfully dissent.

**BARNES, C.J., JOINS THIS OPINION.**